Paul Bovarnick, Bar No. 791654
pbovarnick@rsblaw.net
ROSE, SENDERS, & BOVARNICK, LLC
1205 N.W. 25th Ave.
Portland, OR 97210-2592
(503) 227-2486

Andrew D. Schlichter (*pro hac vice*)
aschlichter@uselaws.com
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102-1816
(314) 621-6115

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| DEBRA MCCLELLAN, ELIZABETH JEAN BRADY, REBECCA MAJOR, ANTHONY OMER, LASHANTE TAYLOR, and LISA EBNER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PROVIDENCE HEALTH & SERVICES,<br><br>Defendant. | Case No.: 3:26-cv-00540-AR<br><br>**AMENDED CLASS ACTION ALLEGATION COMPLAINT**<br>**Federal Wiretap Act (18 U.S.C. § 2510)**<br>**DEMAND FOR JURY TRIAL** |

1. Plaintiffs Debra McClellan, Elizabeth Jean Brady, Rebecca Major, Anthony Omer, LaShante Taylor, and Lisa Ebner ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit against defendant Providence Health & Services for violations of the Federal Wiretap Act, 18 U.S.C. § 2510 et seq. ("FWA"), breach of confidence, intrusion upon seclusion, and unjust enrichment. Plaintiffs allege the following facts based upon personal knowledge, investigation by counsel, and information and belief.

2. Defendant wiretapped its patients in an invasive betrayal of trust. Defendant harvested highly sensitive health-related information from its patients using hidden tracking tools and secretly disseminated these private data to third parties.

3. Plaintiffs were not notified of Defendant's hidden tracking and harvesting of their private information, which began as soon as Plaintiffs loaded Defendant's website. Nor were Plaintiffs provided any opportunity to limit or consent to Defendant's tracking and harvesting of their protected health information ("PHI").

4. Defendant's public-facing representations about its privacy practices were inadequate and affirmatively misleading, including because Defendant stated that no disclosure or "sharing" of Plaintiffs' private health-related information would occur absent Plaintiffs' express written authorization. Yet Defendant surreptitiously tracked and disseminated Plaintiffs' private health-related data, including to third parties Tealium, Inc. ("Tealium"), Amplitude, Inc. ("Amplitude"),

Kameleoon, a French corporation with offices in New York ("Kameleoon"), and Google LLC ("Google").

5. Even within Defendant's purportedly secure patient portal – where patients access claims, past treatment, and review medical conditions – Defendant surreptitiously tracked Plaintiffs' private health-related information. Within this portal, sensitive health-related data of Plaintiffs and other patients were immediately transmitted, in real time, to third-party servers operated by Tealium, Amplitude, Kameleoon, and/or Google without any form of consent.

6. Plaintiffs seek damages and injunctive relief to redress Defendant's unlawful interception and misuse of their private health-related information.

## NATURE OF THE CASE

### A. Defendant's Interception of Website and Portal Communications

7. This action challenges Defendant's practice of surreptitiously intercepting and misusing personal, and highly sensitive, health-related information of Defendant's patients. This unlawful interception occurred on Defendant's www.providence.org website as well as Defendant's password-protected MyChart portal, which patients use to review care and claims, manage treatment, and research their specific medical conditions (together with subpages, the "Website").

8. Defendant violated, and continues to violate, the FWA and Oregon common law by wiretapping the private health-related communications of Plaintiffs on Defendant's Website.

9. Defendant's violations occur as follows: Entirely unbeknownst to Defendant's patients who are using the Website, third-party vendors – including Tealium, Amplitude, Kameleoon, and Google (collectively, the "Third-Party Vendors") – have supplied tracking technologies ("Tracking Pixels" and "Session Replay Code," or "Tracking Technologies") to Defendant, which Defendant embedded on its Website.

10. These Tracking Technologies load immediately on both public-facing pages of Defendant's Website and within the purportedly secure MyChart portal for the purpose of covertly tracking, intercepting, and recording patients' communications with Defendant, including but not limited to patients' keystrokes (text entered into a search box or information box), web addresses (i.e., "URLs") of individual pages visited, Internet Protocol (IP) addresses, mouse movements, clicks, and/or other electronic communications in real time ("Website Communications").

11. After surreptitiously intercepting and capturing the Website Communications of patients, Defendant and the Third-Party Vendors use these Website Communications for purposes that benefit and enrich themselves.

12. The Third-Party Vendors use the harvested personal health-related information to create and/or bolster advertising profiles of Defendant's patients, to target or retarget advertisements to patients, and/or to sell information about patients to other entities for commercial gain.

13. Defendant also uses the harvested information to track visits to the Website, allowing Defendant to covertly recreate detailed replays of portal sessions,

such as when patients search for providers, treatment, or even research by Plaintiffs on pages that discuss their medical issues and ask them to "learn more."

14. Defendant also uses the embedded code that loads immediately on the Website to create a replay of patients' behavior on the Website.

15. This collection of patients' highly sensitive, private data occurs without notice to or consent from Defendant's patients.

16. Defendant causes the collection of this highly sensitive, private data by embedding the code of Tracking Technologies, such as Tracking Pixels, in its Website. The embedded code instantly sends private health-related data to the Third-Party Vendors.

17. Defendant thereby permits the Third-Party Vendors to intercept patients' private health-related information.

18. Defendant embedded Tracking Technologies in its Website and patient poral for its own monetary profit. Defendant benefits financially by obtaining and analyzing data that enables it to add new patients, replacing the need for (and costs associated with) advertising, and surreptitiously finding targets for advertising campaigns.

19. These commercial advantages come at the expense of patients' privacy and contradict Defendant's online promises to safeguard health-related information and legal duty to do the same.

**B. Defendant's Legal Duties and Resulting Harms**

20. Defendant's violations have broad-ranging deleterious effects, including because Defendant holds highly sensitive, personal health-related data of its patients. These data include private medical and health information, as well as related unique personal identifiers, health details, and other data provided by patients related to or for the purpose of obtaining health care.

21. Federal privacy laws require robust privacy protections for these highly sensitive, personal, health-related data.

22. Defendant is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320(d) et seq., because HIPAA defines a "covered entity" to include any "health care provider who transmits any health information in electronic form in connection with a transaction." *See* 45 C.F.R. § 160.103.

23. Defendant is a "health care provider" because it furnishes medical care and treatment through its hospitals, physicians, nurses, clinics, and related facilities. *Id.* (defining "health care provider" to include hospitals and practitioners who furnish, bill, or are paid for health care services).

24. Defendant transmits "health information" with respect to Plaintiffs and its patients as it "[i]s created or received by [Defendant]" and "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." *Id.*

25. With respect to Plaintiffs and patients who are using the Website, Defendant engages in "transactions," or the "transmission of information between two parties to carry out financial or administrative activities related to health care." *Id.*

26. A covered entity must comply with HIPAA privacy and security rules with respect to individually identifiable health information ("IIHI"). *See* 45 C.F.R. §§ 164.302–316; 164.500–534.

27. Covered entities are required to implement administrative, technical, and physical safeguards to protect the confidentiality, integrity, and availability of PHI. 45 C.F.R. § 164.306.

28. Covered entities are prohibited from using or disclosing PHI except as permitted by law. *See* 45 C.F.R. §§ 164.502(a)(3); 164.504(e).

29. Disclosure of PHI for marketing or analytics purposes – such as to data brokers or advertising networks – is expressly prohibited absent valid, written authorization. *See* 45 C.F.R. § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing"); *id.* § 164.508(c)(1)(vi).

30. Defendant acts as a fiduciary with respect to the sensitive data that it collects and manages on behalf of Plaintiffs.

31. By designing, operating, and maintaining the Website through which Plaintiffs access password-protected health information, Defendant assumes the

responsibility and duty to safeguard these data and use them solely for authorized, health-related purposes.

32. This fiduciary duty includes a duty of loyalty and care, requiring Defendant to avoid exploiting Plaintiffs' data for commercial benefit or disclosing data to third parties like the Third-Party Vendors without clear, informed, and express consent.

33. As a result of Defendant's violations and invasions of the privacy rights of its patients, including Plaintiffs, its patients have suffered significant harms, including but not limited to a loss of privacy and control over their data, greatly increased vulnerability to identity theft and fraud, and the unauthorized use of their confidential information for the benefit of others.

34. Plaintiffs bring this action individually and on behalf of a nationwide class of all patients of Defendant whose Website Communications were wiretapped and intercepted via the code embedded on Defendant's Website.

35. Plaintiffs seek all civil remedies provided under the alleged causes of action, including but not limited to compensatory, statutory, treble, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

### A. Plaintiffs

36. Plaintiff Debra McClellan is a resident of Canby in Clackamas County, Oregon. Ms. McClellan is currently receiving care from Defendant. During the

relevant time periods, she used the Website, including the MyChart portal, to review her private health information related to her treatment and payment for it.

37. Plaintiff Anthony Omer is a resident of Spokane in Spokane County, Washington. Mr. Omer is currently receiving care from Defendant and used Defendant's Website to view his private health information, including in the MyChart portal.

38. Mr. Omer's searches and use of the Website and MyChart portal are reflected in screenshots in this Amended Class Action Complaint taken from his actual browsing, including in Figs. 19–22 and his search for an eye condition.

39. Plaintiff Elizabeth Jean Brady is a resident of Richland in Benton County, Washington. Ms. Brady is currently receiving care from Defendant. During the relevant time periods, Ms. Brady visited the Website to review her private health information, including on the MyChart portal.

40. Ms. Brady accessed and used Defendant's MyChart patient portal through the Google Chrome browser on her personal devices.

41. Ms. Brady logged into MyChart and used the portal's "Learn More" option to obtain additional information regarding her specific medical conditions.

42. For example, Ms. Brady reviewed information concerning a digestion condition through MyChart's authenticated portal, by clicking a "Learn More" link associated with that condition.

43. As a result, Ms. Brady's interactions with page visits, searches, and communications concerning health conditions were intercepted and otherwise made available to third parties without her informed consent.

44. Plaintiff LaShante Taylor is a resident of Portland in Multnomah County, Oregon. Ms. Taylor is currently receiving care from Defendant.

45. During the relevant time periods, Ms. Taylor used Defendant's Website and MyChart portal for healthcare-related communications and activities, including checking appointment times, scheduling appointments, messaging healthcare providers, refilling prescriptions, reviewing billing information, and sending documents.

46. Ms. Taylor accessed Providence's website and portal through internet browsers including Chrome and Microsoft Edge, using her devices.

47. Ms. Taylor repeatedly used Providence's Website in connection with both her own healthcare activities and those relating to her son.

48. Plaintiff Rebecca Major is a resident of Republic in Ferry County, Washington. Ms. Major is currently receiving health care from Defendant.

49. During the relevant time periods, Ms. Major used Defendant's MyChart patient portal to review and manage healthcare-related information, including appointments, provider communications, prescription refills, diagnostic imaging, and hospital outpatient visits.

50. Ms. Major accessed and maintained healthcare information through the portal concerning treatment with providers including Bryan R. Anderson, D.O. and Providence Diagnostic Imaging Mount Carmel Hospital.

51. Defendant's MyChart also displayed Ms. Major's medical conditions and health history, like a neurological condition.

52. Defendants disclosed or made available information concerning these healthcare conditions and related portal activity to third-party tracking and analytics vendors through tracking technologies embedded on the Website and MyChart portal.

53. For example, network traffic generated during Ms. Major's use of the Website transmitted data to tealiumiq.com, including persistent identifiers, page URLs, provider-search activity, filter selections, and healthcare-related search terms including the name of her condition.

54. These transmissions allowed third parties to collect and process information concerning Plaintiffs' healthcare interests, provider searches, and interactions with Defendant's online healthcare services without valid authorization or consent.

55. Plaintiff Lisa Ebner is a resident of Tigard in Washington County, Oregon. Ms. Ebner is currently receiving health care from Defendant. During the relevant time periods, she used the Website and MyChart portal to review her private health information, message care providers, attend virtual office visits, and pay her bills.

56. Ms. Ebner used Defendant's MyChart patient portal extensively in connection with serious and ongoing medical treatment, including genetic testing.

**B. Defendant Providence Health & Services**

57. As of 2024, Defendant is one of the largest health systems by operating revenue in the United States.[1]

58. Defendant owns and operates more than 50 hospitals and 1,000 clinics,[2] as well as urgent care centers and digital health platforms throughout the region.[3]

59. Defendant is headquartered in Renton, Washington,[4] and maintains substantial operations, personnel, and physical facilities across Oregon, including major hospitals in Portland, Medford, Newberg, Hood River, and Seaside.[5]

60. Defendant maintains extensive electronic medical record systems, patient portal, and digital platforms that allow patients to schedule appointments,

---

[1] *The Top 10 Nonprofit Health Systems by 2024 Operating Revenue*, FIERCE HEALTHCARE (June 23, 2025), https://www.fiercehealthcare.com/special-reports/top-10-nonprofit-health-systems-2024-operating-revenue [https://perma.cc/WM6P-RZ9F].

[2] *About Us*, PROVIDENCE HEALTH, https://www.providence.org/about [https://perma.cc/53VN-YSV5].

[3] *Providence: World-class health care with human connection*, PROVIDENCE HEALTH, https://www.providence.org/ [https://perma.cc/3BR8-C7C4].

[4] *Contact Us*, PROVIDENCE HEALTH, https://www.providence.org/about/contactus [https://perma.cc/7SSN-UE8Y].

[5] *Caring with Compassion Across Oregon*, PROVIDENCE HEALTH, https://www.providence.org/about/oregon/ [https://perma.cc/4KE6-33TM].

view laboratory results, manage prescriptions, make payments, and learn about their conditions.[6]

61. According to its Website, Defendant reported roughly 29 million total patient visits across its system.[7]

62. Defendant administers its Website through which patients, such as Plaintiffs, access their health plan information for "educational and informational purposes," including reviewing their treatment in the MyChart portal:

Providence maintains this Web site as a health information resource for educational and informational purposes. It is not provided as a professional service or as medical advice for specific conditions, but rather provides general information about certain health and medical conditions. It is not a substitute for professional medical advice and as shall not be construed to be a medical advice under any circumstances. If you have, or suspect you may have, a health condition, you should consult your health care provider for specific medical advice.

*Figure 1*[8]

63. Defendant is a "person" as defined in the FWA. 18 U.S.C. § 2510(6).

## JURISDICTION

### A. Subject Matter Jurisdiction

64. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action in which the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs; there are 100 or more members of the proposed class; and at

---

[6] *Sign Up/Sign In to MyChart*, Providence Health, https://mychartor.providence.org/mychart/Authentication/Login? [https://perma.cc/J9AA-CTJ4].

[7] *About Us*, Providence Health, https://www.providence.org/about [https://perma.cc/53VN-YSV5].

[8] *Website Disclaimer*, Providence Health, https://www.providencehealthplan.com/vi/disclaimer [https://perma.cc/NX93-WFAS].

least one member of the proposed class is a citizen of a different state than Defendant.

65. Defendant's Website includes a "Terms of Use" section that acknowledges its ownership and operation of the Website:[9]

> Providence operates a system of hospitals, physician clinics, home care and other health care providers, a health plan, and associated services in the states of Alaska, California, Montana, New Mexico, Oregon, Texas and Washington. In order to better serve its patients and beneficiaries and to help educate individuals and the general public about health care and medical issues, Providence owns and operates the Providence Web sites, including but not limited to: Providence.org and Swedish.org, (collectively, "Providence Web sites").

66. Defendant consented to jurisdiction in the District of Oregon as part of its Terms of Use, which provide:[10]

> These Terms of Use shall be interpreted consistently with federal law applicable to the parties, including but not limited to HIPAA, provided that state law issues shall be exclusively interpreted according to the laws of the State of Oregon, without regard to choice of law principles. Jurisdiction and venue for any dispute arising from or pertaining to these Terms of Use shall be in the Circuit Court of the State of Oregon for Multnomah or the U.S. District Court for the District of Oregon.

67. This is commonly known as a "forum selection clause."

68. The forum selection clause that designates this District as the venue for legal disputes is not unreasonable as it is where Defendant conducts substantial business with millions of patients.

---

[9] *Terms of Use & Privacy Policy*, PROVIDENCE HEALTH, https://www.providence.org/utility-pages/privacy-policy [https://perma.cc/BF8F-RCRL].

[10] *Id.*

**B. Original Jurisdiction (FWA)**

69. This Court also has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the FWA.

70. Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, known as the FWA, to protect the privacy of wire, oral, and electronic communications from unauthorized interception, disclosure, and use. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, 801-804, 82 Stat. 197, 211–25.

71. In 1986, Congress passed the Electronic Communications Privacy Act ("ECPA") to amend the FWA in order to protect the privacy of electronic communications. Pub. L. No. 99-508, 100 Stat. 1848.

72. The ECPA was enacted to "update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. No. 99-541, at 1 (1986), as reprinted in 1986 U.S.C.C.A.N. 3555, 3555.

73. Title I of the ECPA amended the FWA to expand its coverage beyond wire and oral communication and "address[ ] the interception of . . . electronic communications." S. Rep. No. 99-541, at 3 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3557.

74. The "paramount objective of the [ECPA] is to protect effectively the privacy of communications."[11]

75. The FWA defines "person" to include "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

76. The FWA prohibits any "person" from (1) intentionally intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept any wire, oral, or electronic communication; (2) intentionally disclosing, or endeavoring to disclose, the contents of any such communication knowing or having reason to know it was unlawfully intercepted; or (3) intentionally using, or endeavoring to use, the contents of any such communication knowing or having reason to know it was unlawfully intercepted. 18 U.S.C. § 2511(1).

77. The FWA, as amended by the ECPA, defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." 18 U.S.C. § 2510(12).

78. The term "contents," with respect to communications, includes "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

---

[11] *Joffe v. Google*, 746 F.3d 920, 931 (9th Cir. 2013) (quoting *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 18 (1st Cir. 2003)).

79. The FWA provides a civil cause of action to "[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter" against the person or entity who engaged in such conduct. 18 U.S.C. § 2520(a).

80. The FWA permits recovery of preliminary and permanent injunctive relief, the greater of actual damages or statutory damages calculated at $100 per day or $10,000 per violation, punitive damages, and attorneys' fees and costs. 18 U.S.C. § 2520(b)–(c).

81. Although the FWA includes an exception permitting interception with the consent of "one of the parties to the communication," this exception does not apply where the interception is done "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State" (also commonly known as the "crime-tort exception"). 18 U.S.C. § 2511(2)(d).

## FACTUAL ALLEGATIONS

### I. How Websites Can Use Code to Harvest Users' Private Information

#### A. Websites Can Be Used to Harvest Personal Data from Users

82. Web browsers are software applications that allow users to navigate the internet and view and exchange electronic information and communications.

83. Each "device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

84. Websites are hosted on servers, which are computers that store the site's data and facilitate the exchange of information between the website and the users' browsers.

85. Websites have domains, which are the human-readable name of the website, or what someone types into a browser to get to the site – with examples like google.com.

86. An HTTP request is a message sent from a web browser to a website's server to ask for information, such as loading a webpage or submitting a query.

87. An HTTP response is the message that a website's server sends in response to an HTTP request to the browser. It includes the requested information.

88. Web interactions involve HTTP requests and HTTP responses, with each browsing session typically involving thousands of these exchanges.

89. When a user visits a website, the website sends a small amount of data, known as a "cookie," to be stored on the user's browser.

90. Cookies are then stored locally on the user's browser and included with future requests to the same server.

91. Cookies are used to "remember" users between sessions, including how users interact with the website.

92. When users log in to a website and it "remembers" them, it is often because of a cookie.

93. Because of the data and privacy concerns associated with cookies, many legal jurisdictions regulate their use. For example, California's Consumer

Privacy Act requires businesses to disclose the use of cookies, and the European Union's General Data Protection Regulation mandates user consent before cookies are placed on devices.

94. When a user visits a website, the browser sends an HTTP request to the server, requesting specific information – for example, the "Find a Doctor" selection on Defendant's Website.

95. The server responds with an HTTP response, which includes the requested data in the form of "markup."

96. This markup is the underlying structure for what the user sees on the webpage, such as text, images, and interactive elements.

97. Websites are built using this markup and "source code," which provides instructions to the browser, dictating how the page behaves when it loads or when a particular action occurs.

98. Source code may be written to include instructions to send data to third parties via background HTTP requests.

99. Users may be unaware that data are being sent to third parties.

100. Background requests can be designed to function like a digital wiretap, capturing and transmitting communications and facilitating the covert harvesting of consumer data.

101. Website source code may be written to send website user data outside of the website.

102. This source code can send information – like searches or messages – from the user's browser to the website's server.

103. The requests contained in source code can secretly send user data to third parties.

104. HTTP requests may be used to send data such that transmissions are not visible; users are generally unaware of website data transmissions occurring in the background.

105. When source code is written to send data requests to third-party tracking domains and servers, third parties may receive user data that users did not intend to disclose.

### B. Tracking Pixels and Session Replay Code Can Be Used to Extract Individuals' Private Information

106. Tracking Pixels include a broad range of HTML and JavaScript code embedded in websites and emails.[12]

107. Tracking Pixels are hidden from sight.

108. Tracking Pixels trigger a network traffic request to the tracking entity's remote server.

109. By triggering this network traffic request, Tracking Pixels can track, collect, and send to third parties various private and/or personal data, such as how a user interacts with a website or information typed into text fields.[13]

---

[12] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking [https://perma.cc/Y8TJ-53FD].
[13] *Id.*

110. Because Tracking Pixels embedded into websites such as Defendant's Website operate silently in the background, users who are not told otherwise do not realize that their private and personal data are being collected as they browse the website.[14]

111. Tracking Pixels may collect various types of information, including sensitive information.

112. Some Tracking Pixels harvest data regarding website users' entertainment or shopping habits and preferences.

113. In this case, the Tracking Pixels embedded on Defendant's Website do not merely collect shopping trends or similar commercial data; instead, Defendant's Tracking Pixels collect highly sensitive, personal health-related information.

114. Traditional methods of preventing web-browsing data from being collected, such as blocking third-party cookies, frequently do not prevent Tracking Pixels from collecting user data. As a result, users may have no effective way to block the collection of their private information by Tracking Pixels.[15]

115. While some Tracking Pixel providers claim that they attempt to remove personal information from the data they collect, these efforts are not always successful.

---

[14] *Id.*
[15] *Id.*

116. For example, the Federal Trade Commission ("FTC") has said that methods such as "hashing" personal information to scramble it may be inadequate.[16]

117. Session Replay Code operates similarly to Tracking Pixels, often relying on network traffic requests to transmit recorded interaction data.

118. However, Session Replay Code extracts even more intrusive details about users' browsing behavior.

119. Specifically, Session Replay Code logs and tracks *everything* a user does on a webpage, including mouse movements, clicks, scrolls, and taps, and can actually track every single key stroke, creating a *complete* reproduction of the user's visit to the website.[17]

120. Network traffic requests are also often used by Tracking Pixels and Session Replay Code to send user data back to third-party servers.

## II. Confidential Personal Heath Data Covertly Obtained from Websites Presents Serious Privacy Risks

121. Data pertaining to individuals are so valuable they have been compared to the "new oil."[18]

---

[16] *Id.*; Ed Felten, *Does Hashing Make Data "Anonymous"?*, FTC (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous [https://perma.cc/5UMN-UZR4].

[17] *The definitive guide to session replay*, FULLSTORY (Oct. 8, 2024), https://www.fullstory.com/blog/session-replay/ [https://perma.cc/56WH-8GQ5].

[18] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data [https://perma.cc/US3V-CPCU].

122. However, the market for such data, and in particular personal health-related data, presents serious privacy risks.

123. For this reason, Time Magazine has pointed out that the health data market, while highly lucrative, poses a significant risk to individuals' privacy.[19]

124. Nevertheless, the enormous value of personal health data incentivizes businesses to use invasive Tracking Technologies on their websites to collect these data from website users.

125. For example, the data collected by Tracking Pixels are valuable to businesses because they can use them to track internet users and target ads based on prior browsing behavior.[20] This practice can be highly lucrative.

126. As one report explained, "There's a whole market of brokers who compile the [personal health] data from providers and other health-care organizations and sell it to buyers."[21]

127. According to a report from cybersecurity company Feroot Security, "medical-related websites continue to be mined for data including personal medical information[.]"[22]

---

[19] Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ [https://perma.cc/F3WR-HHVL].

[20] *Id.*

[21] Christina Farr, *Hospital Execs Say They Are Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html [https://perma.cc/D7CL-N3HX].

[22] *Private Health Data Still Being Exposed to Big Tech, Report Says*, INSURANCE JOURNAL (Oct. 17, 2023),

128. As early as 2015, experts were researching how confidential health information is shared with third parties without users' knowledge.[23]

129. In June 2022, an investigation by The Markup[24] revealed that one Tracking Pixel, the Meta Pixel, collected and sent a "data packet" to Facebook whenever a user engaged with some hospital websites, such as clicking to schedule a doctor's appointment.

130. Further research by The Markup revealed that the personal health data transmitted to Facebook by the Meta Pixel from hospital websites included not only sensitive health information, such as details about medications, allergies, and upcoming doctor visits, but also personally identifiable information, including patients' names, addresses, email addresses, and phone numbers.

131. Additionally, The Markup's investigation found that the Meta Pixel was embedded in public-facing hospital websites and within password-protected patient portals at seven health systems, including FastMed and Novant Health.[25]

132. The FTC has taken enforcement action against internet providers who track sensitive health data.

---

https://www.insurancejournal.com/news/national/2023/10/17/744625.htm [https://perma.cc/M8YP-WDKU].

[23] Timothy Libert, *Privacy Implications of Health Information Seeking on the Web*, COMMUNICATIONS OF THE ACM (Mar. 2015), https://timlibert.me/pdf/Libert-2015-Health_Privacy_on_Web.pdf [https://perma.cc/NC4F-5GRZ].

[24] *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites [https://perma.cc/3X7W-MMJB].

[25] *Id.*

133. For example, in June 2022, the FTC finalized a settlement with Facebook regarding its covert collection of sensitive medical data when Flo, an ovulation tracking app, shared users' private health information with Facebook[26] and other advertisers.[27]

## III. The Unauthorized Collection of Personal Health Data Contravenes Legal, Ethical, and Social Norms

### A. Website Users Reasonably Expect Personal Health Information to Be Confidential

134. Personal health data collected by Tracking Pixels, Session Replay Code, and other Tracking Technologies may be "highly personal information that people choose not to disclose even to family, friends, or colleagues," which nevertheless "is actually shared with complete strangers."[28]

135. According to the FTC, PHI is "[a]mong the most sensitive categories of data collected by connected devices[.]"[29]

---

[26] *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, FTC (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google [https://perma.cc/V33W-LEEE].

[27] Justin Sherman, *Your Health Data Might Be for Sale*, SLATE (June 22, 2022), https://slate.com/technology/2022/06/health-data-brokers-privacy.html [https://perma.cc/L7U4-4VMW].

[28] *Report: Companies Continue to Share Health Data Despite New Privacy Laws*, CONSUMER REPORTS (Jan. 16, 2024), https:advocacy.consumerreports.org/wp-content/uploads/2024/01/Companies-Continue-to-Share-Health-Data-1-16-2024-Consumer-Reports.pdf [https://perma.cc/7WFB-BBTW].

[29] Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].

136. Personal health information collected by websites "may pose an incalculable risk to personal privacy."[30]

137. The practice of allowing third-party vendors to "collect that data, combine it, and sell or monetize it" would be an "unprecedented intrusion."[31]

138. That is exactly what Defendant has done, and is doing.

139. Consumers' confidence that their personal and private health data will be kept secure is a major public health issue.

140. A 2015 review found that "the social stigma associated with some health conditions is among the top reasons consumers delay or avoid getting help for mental health problems."[32]

141. The fear of "disclosure and confidentiality concerns" was a prominent cause of this stigma.[33]

142. Once a person's private and sensitive health information is available, it exposes that individual to significant harm.

---

[30] *Id.*

[31] *Id.*

[32] *Report: Companies continue to share health data despite new privacy laws*, CONSUMER REPORTS (Jan. 15, 2024), https://advocacy.consumerreports.org/research/report-companies-to-share-health-data-despite-new-privacy-laws/ [https://perma.cc/2WRY-6QAB].

[33] *Id.*

143. Personal health data are used by criminals and other malevolent actors to facilitate phishing scams, commit identity theft, and inflict physical or emotional injury.[34]

144. Information about private health and medical matters, especially data related to sexual activity or reproductive health, "may subject people to discrimination, stigma, mental anguish, or other serious harms."[35]

### B. Personal Heath Information Can Be Harvested for Commercial Gain

145. Companies that collect personal information "have a profit motive to share data at an unprecedented scale and granularity."[36]

146. Once an individual's personal and private health data are collected, they "often have no idea who has it or what's being done with it."

147. The data "enters a vast and intricate sales floor frequented by numerous buyers, sellers, and sharers."[37]

---

[34] Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].
[35] *Id.*
[36] *Id.*
[37] *Id.*

148. In a 2014 study, the FTC reported that data brokers use data collected from consumers to create profiles that may contain sensitive inferences, such as categorizing someone as an "expectant parent."[38]

149. Once these invasive and sensitive profiles have been created, the brokers use them to target "personalized" ads at people, tracking them across the internet.[39]

150. The categories that consumers are placed into can be incredibly private or invasive, such as "working-class mom," "frequent alcohol drinker," "financially challenged," or "depression sufferer."[40]

151. In the same 2014 study, one data broker bragged to shareholders that it had 3,000 points of data for nearly every consumer in the United States.[41]

---

[38] *Id.*; *Data Brokers: A Call For Transparency and Accountability: A Report of the Federal Trade Commission*, FTC (May 2014), https://www.ftc.gov/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014 [https://perma.cc/4LSS-RTV6].
[39] *Id.*
[40] *Online Advertising & Tracking,* EPIC, https://epic.org/issues/consumer-privacy/online-advertising-and-tracking/.
[41] *Data Brokers: A Call For Transparency and Accountability: A Report of the Federal Trade Commission*, FTC (May 2014), https://www.ftc.gov/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014 [https://perma.cc/4LSS-RTV6]; Kristin Cohen, *Location, Health, and Other Sensitive Information: FTC Committed to Fully Enforcing the Law Against Illegal Use and Sharing of Highly Sensitive Data*, FTC (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].

152. Data aggregators and brokers gather this collected personal data and "sell access to it (or analyses derived from it) to marketers, researchers, and even government agencies."[42]

153. The scale of the personal and private data flowing from users to brokers is staggering.

154. The sheer number of ads shown to internet users is overwhelming, with Americans exposed to an estimated 5,000 ads daily.[43]

155. According to the FTC, "some popular ad exchanges can handle tens of billions of auctions per day. Each auction involves a broadcast of consumer data being sent to potentially dozens of bidders simultaneously, despite only one of those parties – the winning bidder – actually using that data to serve a targeted ad."[44]

156. Once private and personal data are in the hands of data brokers, "there are few (if any) technical controls ensuring that [they] do not retain that data for use in unintended ways."[45]

### C. Unauthorized Collection and Tracking of Private Health Information Is Prohibited

157. Defendant is a "covered entity" under HIPAA because it functions as a health care provider that operates hospitals and clinics for patient care.

---

[42] *Id.*
[43] *Online Advertising & Tracking*, EPIC, https://epic.org/issues/consumer-privacy/online-advertising-and-tracking/.
[44] *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FTC (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla [https://perma.cc/8WYU-UPGW].
[45] *Id.*

158. The U.S. Department of Health and Human Services ("HHS") has issued a bulletin covering the use of online Tracking Technologies, such as Tracking Pixels and Session Replay Code, by these HIPAA-covered entities. The bulletin clarifies the privacy and security rules promulgated under HIPAA, 42 U.S.C. §§ 1320d–1320d-9.

159. The HHS bulletin states that "[r]egulated entities are not enabled to use tracking technologies in a manner that would result in impermissible disclosures of [PHI] to tracking technology vendors or any other violations of the HIPAA rules."[46]

160. The bulletin continues, "[f]or example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[47]

161. The bulletin further explains that PHI collected by Tracking Technologies placed on websites, such as Tracking Pixels and Session Replay Code, can include "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[48]

---

[46] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html [https://perma.cc/LT73-TWQD].
[47] *Id.*
[48] *Id.*

162. Defendant's use of Tracking Technologies on the Website, such as Tracking Pixels, violates the HHS's bulletin, which explicitly states that regulated entities like Defendant are not permitted to use Tracking Technologies in ways that lead to impermissible disclosures of PHI to third parties without first obtaining HIPAA-compliant authorizations.

163. The HHS bulletin further clarifies that disclosure of PHI to vendors for marketing purposes (including targeted advertising or analytics used to improve advertising performance) violates HIPAA without HIPAA-compliant authorization from the individual.

164. Defendant's conduct, including enabling Third-Party Vendors to track patients on Defendant's Website for advertising purposes, is exactly the type of unauthorized data sharing of sensitive medical information that the HHS bulletin states is prohibited.

165. On user-authenticated websites, which require a user to log in before gaining access to the site, Tracking Technologies may "have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal."[49]

166. Even on unauthenticated websites, which do not require users to log in before gaining access to the website, Tracking Technologies may obtain access to an individual's PHI.

---

[49] *Id.*

167. The HHS bulletin gives the following example: "[I]f an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[50]

168. The HHS bulletin outlines the harms that disclosure of PHI may cause, including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI."[51]

169. The disclosure of an individual's PHI "can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment."[52]

170. In a joint letter sent on July 23, 2023, to hospital systems and telehealth providers, the FTC and the HHS Office for Civil Rights also reiterated the risks posed by the disclosure of an individual's PHI to third parties.

171. The joint letter noted that such disclosures could reveal "sensitive information including health conditions, diagnoses, medications, medical

---

[50] *Id.*
[51] *Id.*
[52] *Id.*

treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment."[53]

172. At the state level, Oregon law provides that "(1) It is the policy of the State of Oregon that an individual has: (a) The right to have protected health information of the individual safeguarded from unlawful use or disclosure." Or. Rev. Stat. ("ORS") § 192.553.

173. Accordingly, Oregon grants protections for medical records, like ORS §§ 192.553–192.581 (requiring reasonable safeguards to protect medical information and notice of a breach involving medical information); ORS §§ 192.518–192.530 (guaranteeing a patient's right to access medical records and requiring providers to maintain confidentiality and security); and ORS § 743.045 (regulating insurers' handling of medical information, which is to be maintained under strict confidentiality).

174. The American Medical Association's ("AMA") *Code of Medical Ethics* also promulgates rules that protect the privacy of patient data and communications.

175. These AMA rules include, but are not limited to, *AMA Code of Medical Ethics* Opinion 3.1.1 ("[p]atient privacy encompasses a number of aspects, including . . . personal data"); Opinion 3.2.4 ("Information gathered and recorded in association with the care of the patient is confidential."); and Opinion 3.3.2

---

[53] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FTC (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking [https://perma.cc/EB3S-UF3V].

("Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored.").

## IV. Confidentiality Expectations in Member Portals

176. Password-protected portals are subpages of a health insurer's website to which users gain access only after registering, verifying identity, and logging in with credentials.

177. These portals typically provide individualized services to users, including the ability to research medical and health issues, view insurance claims, obtain explanations of benefits, track insurance deductibles, review prescriptions, and update member profile information.[54]

178. Portals function as live dashboards, providing, among other things, updates on claims, prescriptions, lab results, and secure messaging. Because these updates are continuous, portal activity creates a detailed summary of an individual's health. Studies show that increased portal use is associated with better health outcomes.[55]

179. Portal content is nonpublic and tailored to each patient; it is not accessible to anonymous website visitors.

---

[54] Courtney R. Lyles, Janey Hamblin, Victor Y.X. Lin, Dean Schillinger, *Legal, Practical, and Ethical Considerations for Making Online Patient Portals Accessible for All*, 107 Am. J. Pub. Health 1608 (Oct. 2017), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5607665/pdf/AJPH.2017.303933.pdf [https://perma.cc/U52A-RE2Q].

[55] *Id.*

180. Because portal interactions are tied to a specific user's identity, the data displayed or transmitted often constitutes IIHI, a category of PHI under HIPAA. 45 C.F.R. § 160.103.

181. From a patient's perspective, logging into a portal signals entry into a private communication channel with the health care provider in which there is an expectation that health information shared in the portal will be kept confidential.[56]

## V. Defendant Covertly Intercepted Plaintiffs' Sensitive Health Information for Commercial Profit

### A. Defendant Covertly Wiretaps Website Communications Within Both its Public Facing Page and its Confidential Portal

182. Despite deep public concerns about internet privacy and the sensitivity of personal health-related data, Defendant unlawfully embedded code on its Website that allows Third-Party Vendors to harvest, for financial benefit, the sensitive private health information of the users of Defendant's Website, patients of Defendant.

183. Defendant also benefits from the Tracking Technologies on the Website, because data from these Tracking Technologies allow Defendant to identify groups or segments among its patients and refine marketing to increase enrollment and revenue.

184. Defendant operates a primary patient portal (the "Portal") at the web addresses mychartor.providence.org and mychartwa.providence.org. The exact web

[56] *K.L. v. Legacy Health*, No. 23-1886, 2024 U.S. Dist. LEXIS 206864, at *9 (D. Or. Nov. 14, 2024).

address of the Portal slightly changes based on the state (i.e., Oregon: "mychartor.providence.org," or Washington: "mychartwa.providence.org").

185. After patients enter login credentials, they can retrieve results of medical tests, communicate with doctors, pay medical bills, and access summaries of health visits, among other actions involving highly sensitive, private health data.

186. By embedding this tracking inside portals, Defendants violated HIPAA's privacy rules by improperly disclosing PHI to the Third-Party Vendors. This violation occurred even if Plaintiffs had not done a single search, as patient status itself is PHI under HIPAA, and Plaintiffs' logins confirmed that they are receiving or have received care. *See Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1081–82 (W.D. Wash. 2024) (stating, within a HIPAA framework, "[a]s other Courts within this Circuit have acknowledged, the transmission of information submitted to a *private patient portal*—such as a user clicking on the 'log in' button on that webpage—reveals patient status, which in and of itself is protected health information."); *In re Meta Pixel Healthcare Litig.,* 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (finding that "patient status is protected health information" under HIPAA).

187. The Portal displays patients' health conditions (for example, having undergone a "Shingles vaccine"), and provides a "Learn more" button associated with each condition. Fig. 2. Clicking that button serves condition-related information from the domain of providenceportallib.staywellsolutionsonline.com.




*Figure 2*[57]

188. StayWell Company, LLC ("StayWell") is a subsidiary of WebMD Health Corp. and offers patient education solutions.[58]

189. The Portal presents search results in a manner that gives patients the impression they remain within the Portal while engaging with those results.

190. Defendant's Portal provides no disclaimer, notice, acknowledgement, or any similar notification that the patient has navigated off the Portal and into a subpage where the domain is StayWell.

191. Similarly, when patients search for tailored medical care within the Portal, such as substance abuse counseling, the information is served via the domain providence.findhelp.com, a subpage of Defendant's public-facing Website with the "Find Help" tool.

192. In both of these instances, patients are not given notice that they are navigating away from the Portal.

---

[57] This screenshot was taken on the Portal (emphasis added).

[58] *About StayWell and Krames*, WEBMD IGNITE (last updated Oct. 2022), https://phl.ascension.org/about-staywell-and-krames?language_content_entity=en [https://perma.cc/NZ29-QFMV].

193. The same pattern occurs with other features of Defendant's Portal. For example, when patients use the urgent care locator, they are silently redirected from the Portal to Defendant's public-facing Website.

194. Although the urgent care locator appears within the Portal and uses the providence.org domain, patients are not informed they have left the Portal.

195. Defendant has surreptitiously embedded the Tracking Technologies of the Third-Party Vendors within the public-facing pages of the Website and its purportedly secure Portal.

### B. Defendant Enables Tealium's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portal

#### 1. Tealium as a Tracking Vendor

196. Defendant embedded the Tracking Technologies of Third-Party Vendor Tealium within the Portal, enabling the interception and collection of patients' private data and communications, including health-related queries, without patients' consent.

197. Tealium is a company based in San Diego, California that helps businesses track and organize information about their users. It provides tools that allow companies to collect data from many places and store the data in one system.

198. Tealium advertises that it can "collect [user] data, ensure data quality, and send it anywhere" in real time.[59] Tealium's AudienceStream tool allows its

[59] *Products: Real-time data collection and data quality*, TEALIUM, https://tealium.com/products-real-time-data-collection-and-quality/ [https://perma.cc/5NBW-WKS2].

customers, like Providence, to "[t]urn disparate [user] data silos into actionable [user] profiles."[60]

199. In fact, on Tealium's webpage titled "Tealium for Healthcare," which details HIPAA compliance, Tealium identifies one of its key features as "integrations with the world's largest media partners like Meta and Google."[61]




*Figure 3*[62]

200. Tealium encourages companies to integrate its tools with other advertising and tracking companies to "quickly and effectively connect your systems and data." [63]




*Figure 4*[64]

---

[60] *Products: Real-time CDP and Predictive Insights*, TEALIUM, https://tealium.com/products-real-time-cdp-predictive-insights/ [https://perma.cc/KER8-YNVP].
[61] *Tealium for Healthcare*, TEALIUM, https://tealium.com/products/tealium-for-healthcare/ [https://perma.cc/5QBC-MMET].
[62] *Id.* (emphasis added).
[63] *Id.*
[64] *Id.*

2. <u>Tracking on Portal Entry and Subpages</u>

201. When a patient reaches the Portal landing page, a request from Tealium's iQ tag management (a tool that lets a website operator control Tracking Technologies),[65] https://tags.tiqcdn.com, loads simultaneously, transmitting the patient's data to Tealium's servers *before* the patient takes any actions on the page:




*Figure 5*[66]

[65] *TiQ Tag Management*, TEALIUM, https://tealium.com/products/tealium-iq-tag-management-system/ [https://perma.cc/Y6A3-2ZJT].

[66] This screenshot was taken on the Portal landing page (emphasis added).

202. According to Tealium's support platform, Tealium iQ is a tool that lets a website control which Tracking Technologies a patient's browser runs and what information those Tracking Technologies send outward to third-party servers.[67]

203. Tealium iQ then collects and stores the patient's subsequent page views to "optimize network traffic and page performance."[68] For example, the request URL shown in Fig. 5 continues to tag and track patient interactions on sensitive subpages of the Portal such as those enabling patients to review medical test results and schedule a vaccine.

204. Likewise, when a patient uses the Portal to review a summary of their medical billing, Tealium issues a simultaneous request collecting aspects of the patient's supposedly private financial and medical inquiries:

[67] *How Tealium iQ works*, TEALIUM DOCS, https://docs.tealium.com/iq-tag-management/getting-started/how-tealium-iq-works/ [https://perma.cc/2Q5P-76RD].
[68] *Id.*




*Figure 6*[69]

205. The request URL shown in Fig. 6, https://tealium.wheelhousedmg.com, is embedded in the Portal by Tealium and refers to its partner, Wheelhouse Digital Marketing Group. Wheelhouse offers lead generation, conversion rate optimization and enterprise analytics strategies.[70] Patient data are therefore not transmitted to

---

[69] This screenshot was taken on the Portal at the domain mychartwa.providence.org/mychart/Billing/Summary (emphasis added).

[70] *Partner: Wheelhouse*, TEALIUM, https://tealium.com/partner/wheelhouse/ [https://perma.cc/YC5H-D852].

Tealium servers in isolation; rather, they are additionally routed to Tealium's various third-party advertising partners like Wheelhouse for further analysis.

206. Tealium further obtains each patient's – including Plaintiffs' – IP addresses.

3. Tealium's Integration with Oracle Automated Advertising

207. Oracle Corporation ("Oracle") is a software company providing cloud services to help businesses manage data.[71] Oracle offers a tool, Eloqua Marketing Automation ("Eloqua"), which boasts features such as "[t]argeting and segmentation," "[a]ccount-based marketing," and "[l]ead and account scoring."[72]

208. Specifically, Oracle Eloqua enables customers such as Providence to "[c]ombine behavioral and filmographic data from various sources to build, filter, and segment audiences for precise targeting based on specific attributes and interests" and to "adapt to [website users'] evolving interest in real time."[73]

209. Tealium encourages its customers to integrate with Oracle Eloqua to "enrich" marketing campaign creation and lead management (the process of converting potential customers into paying customers).[74]

210. Oracle's Tracking Technologies are embedded within Tealium's Tracking Technologies on public-facing pages of Defendant's Website.

---

[71] *Homepage*, ORACLE, https://www.oracle.com/.
[72] *Oracle Marketing*: *Eloqua Marketing Platform*, ORACLE, https://www.oracle.com/cx/marketing/ [https://perma.cc/66T8-R8DZ].
[73] *Oracle Eloqua Marketing Automation: Campaign orchestration*, ORACLE, https://www.oracle.com/cx/marketing/automation/ [https://perma.cc/BXQ7-XQR6].
[74] *Oracle Eloqua*, TEALIUM, https://tealium.com/integrations/eloqua-2/ [https://perma.cc/H73E-YQNT].

211. For example, when a patient accesses Defendant's "Find a Doctor" tool,[75] searches for a provider with the specialty "OBGYN" and selects a specific provider to view their information, Oracle Eloqua embeds various tracking parameters in a request executed by Tealium's iQ:




*Figure 7*[76]

---

[75] *Find a Doctor*, PROVIDENCE HEALTH, https://www.providence.org/doctors [https://perma.cc/6XEH-X7CG].

[76] Screenshot taken on the public-facing website (www.providence.org) after a user selected Find a Doctor > OBGYN and viewed information for a specific provider (emphasis added).

```
ponse   Initiator   Timing
lqSetSiteId", u.elqSetSiteId]);
< u.extend.length; c++) {

extend[c](a, b);
== false)
turn
) {}


.loader.GV(u.map)) {
 b[d] !== "undefined" && b[d] !== "") {
map[d].split(",");
 = 0; f < e.length; f++) {
 (e[f] == "base_url" || e[f] == "form_tracking" || e[f] == "elqFormName" || e[f] == "elqFormGUIDEleme
  u[e[f]] = b[d];
else {
  _elqQ.push([e[f], b[d]]);



lqUseFirstPartyCookie', b.elqTrackingDomain]);
lqTrackPageView']);
cking == true || u.form_tracking == "true" || u.form_tracking == "on" || u.form_tracking == "yes") {
= null;
= 5;
aitUntilCustomerGUIDIsRetrieved() {
(u.timerId)) {
 (u.timeout == 0) {
  return;

 (typeof this.GetElqCustomerGUID === 'function') {
  document.forms[u.elqFormName].elements[u.elqFormGUIDElement].value = GetElqCustomerGUID();
  return;

timeout -= 1;

rId = setTimeout(WaitUntilCustomerGUIDIsRetrieved, 500);
;

ustomerGUIDIsRetrieved();
(['elqGetCustomerGUID']);
```

*Figure 8*[77]

212. According to Oracle's Eloqua Help Center, its unique tracking parameters can be identified as script beginning with "elq."[78] As seen in Fig. 8, which shows additional code associated with the Fig. 7 request, Oracle's marketing platform collects various aspects of the patient's browsing behavior such as: i)

---

[77] Code associated with the Fig. 7 request.

[78] *Oracle Eloqua tracking parameters*, ORACLE, https://docs.oracle.com/en/cloud/saas/marketing/eloqua-user/Help/EloquaAsynchronousTrackingScripts/EloquaTrackingParameters.htm [https://perma.cc/RM88-Y2A6].

"RecipientId," which ties the patient to Defendant's Website in Oracle's databases; ii) "CampaignId," which records the name of the associated marketing campaign; and iii) "AssetId," which tracks in which page the link had been located.[79]

213. Likewise, when a patient visits the "Spiritual Health" subpage of the Website,[80] the same Tracking Technologies shown in Fig. 8 are active, in addition to another identifier assigned by Eloqua via the cookie eloqua_guid, which can similarly be used within Oracle's databases to perform a "visitor data lookup."[81]

```
//tealium universal tag - utag.16 ut4.0.202602201059, Copyright 2026 Tealium.com Inc. All Rights Reserved.
window._elqQ = window._elqQ || [];
try {
    (function(id, loader, u) {
        try {
            u = utag.o[loader].sender[id] = {}
        } catch (e) {
            u = utag.sender[id]
        }
        ;u.ev = {
            'view': 1
        };
        u.qsp_delim = '&';
        u.kvp_delim = '=';
        u.elqSetSiteId = "1129361478";
        u.base_url = "//img.en25.com/i/elqCfg.min.js";
        u.map = {};
        u.extend = [function(a, b) {
            try {
                if ((typeof b['eloqua_guid'] != 'undefined' && typeof b['eloqua_guid'] != 'undefined' && b['eloqua_guid']
                    document.cookie = "ELOQUA=" + b['eloqua_guid'] + ";path=/;domain=" + utag.cfg.domain + ";expires=";
                    b['cp.ELOQUA'] = b['eloqua_guid'];
                }
            } catch (e) {
                utag.DB(e);
```

*Figure 9*[82]

[79] *Examples of data lookup usage*, ORACLE, https://docs.oracle.com/en/cloud/saas/marketing/eloqua-user/Help/EloquaAsynchronousTrackingScripts/ExampleWebDataLookups.htm [https://perma.cc/Z7YJ-YR4V].

[80] *Services: Spiritual Health*, PROVIDENCE HEALTH, https://www.providence.org/services/spiritual-care [https://perma.cc/P766-HLEU].

[81] *Examples of data lookup usage*, ORACLE, https://docs.oracle.com/en/cloud/saas/marketing/eloqua-user/Help/EloquaAsynchronousTrackingScripts/ExampleWebDataLookups.htm [https://perma.cc/Z7YJ-YR4V].

[82] *Id* (emphasis added).

214. As seen in Fig. 9, Eloqua's Tracking Technologies are embedded within a request executed by Tealium, which "automatically gathers…various data values from the page and combines them into one central data object to be made available to [customers'] tags and load rules."[83] Data associated with patients' sensitive searches on both the public-facing website and the Portal are surreptitiously gathered by Tealium and Oracle's Tracking Technologies and are transmitted to both parties; Tealium collects and standardizes the data and Oracle uses them for marketing.

### C. Defendant Enables Amplitude's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portal

#### 1. Amplitude as a Tracking Vendor

215. Defendant embedded the Tracking Technologies of Third-Party Vendor Amplitude within the Portal, enabling the interception and collection of patients' private data and communications, including health-related queries, without patients' consent. As part of this interception and collection of patients' private data and communications, Amplitude obtains the IP address of every individual who used Defendants' Website and patient portal, including Plaintiffs'.

216. Amplitude, headquartered in San Francisco, California, is an AI-driven analytics platform, which provides companies with the "unfair AI advantage . . . to grow relentlessly."[84]

---

[83] *About the Universal Tag*, TEALIUM, https://docs.tealium.com/iq-tag-management/getting-started/install/about-utag/ [https://perma.cc/GZ5Y-4Z7V].
[84] *AI Analytics Platform for Modern Digital Analytics*, AMPLITUDE, https://amplitude.com [https://perma.cc/WV6R-JD8A].

217. Amplitude offers customers like Defendant the ability to "dig deeper into every click" with Amplitude's Product Analytics service, which is a web analytics service focused on "find[ing] out firsthand what moves the needle . . . across the entire customer journey[.]" Amplitude also offers Session Replay, a service designed to exactly recreate and analyze user behavior on a website.[85]

2. <u>Tracking on Portal Entry, Subpages, and Unique Identifiers</u>

218. When an insured reaches the patient Portal landing page, an Amplitude request embedded within a JavaScript file loads simultaneously, transmitting the patient's data to Amplitude *before* the patient takes any other action:

| ▼ General | |
|---|---|
| Request URL | https://cdn.amplitude.com/libs/analytics-browser-2.2.0-min.js.gz |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 18.172.134.10:443 |
| Referrer Policy | same-origin |
| ▼ Response Headers | |
| Accept-Ranges | bytes |
| Access-Control-Allow-Methods | GET, HEAD |
| Access-Control-Allow-Origin | * |
| Access-Control-Max-Age | 3000 |
| Age | 2622190 |
| Cache-Control | max-age=31536000 |
| Content-Encoding | gzip |
| Content-Length | 17242 |
| Content-Type | application/javascript |
| Date | Tue, 21 Oct 2025 12:09:14 GMT |
| Etag | "d22c28dd9da320f2b299adb1953fb50d" |
| Last-Modified | Tue, 15 Aug 2023 16:50:26 GMT |
| Server | AmazonS3 |
| Vary | Origin,Access-Control-Request-Headers,Access-Control-Request-Method |
| Via | 1.1 0f49af3a0f69d8fa8a5350f615899778.cloudfront.net |

*Figure 10*[86]

[85] *Id.*
[86] This screenshot was taken on the Portal landing page (emphasis added).

219. Similar data transmissions occur to Amplitude when a patient uses the Portal to review upcoming medical appointments, Fig. 11, and to review or pay bills, Fig. 12.




*Figure 11*[87]

[87] This screenshot was taken on the Portal (emphasis added).

eneral

| | |
|---|---|
| uest URL | https://cdn.amplitude.com/libs/analytics-browser-2.2.0-min.js.gz |
| uest Method | GET |
| us Code | 200 OK |
| note Address | 18.172.134.68:443 |
| errer Policy | same-origin |

esponse Headers

| | |
|---|---|
| ept-Ranges | bytes |
| ess-Control-Allow-Methods | GET, HEAD |
| ess-Control-Allow-Origin | * |
| ess-Control-Max-Age | 3000 |
| : | 2623858 |
| he-Control | max-age=31536000 |
| tent-Encoding | gzip |
| tent-Length | 17242 |
| tent-Type | application/javascript |
| e | Tue, 21 Oct 2025 12:09:14 GMT |
| j | "d22c28dd9da320f2b299adb1953fb50d" |
| :-Modified | Tue, 15 Aug 2023 16:50:26 GMT |
| ver | AmazonS3 |
| y | Origin,Access-Control-Request-Headers,Access-Control-Request-Method |
| | 1.1 083eaf3abfded847b96b132a2fc045fc.cloudfront.net (CloudFront) |

*Figure 12*[88]

220. Amplitude's tracking of a patient's information within the Portal extends beyond the main page and financial information. A similar data transmission occurs in the Portal's "Medical Testing Subpage." Fig. 13. The "Medical Testing Subpage" allows patients to review the results of recent medical tests.

---

[88] This screenshot was taken on the Portal (emphasis added).

| | |
|---|---|
| Request URL | https://cdn.amplitude.com/libs/analytics-browser-2.2.0-min.js.gz |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 18.172.134.10:443 |
| Referrer Policy | same-origin |
| ▼ Response Headers | |
| Accept-Ranges | bytes |
| Access-Control-Allow-Methods | GET, HEAD |
| Access-Control-Allow-Origin | * |
| Access-Control-Max-Age | 3000 |
| Age | 2622190 |
| Cache-Control | max-age=31536000 |
| Content-Encoding | gzip |
| Content-Length | 17242 |
| Content-Type | application/javascript |
| Date | Tue, 21 Oct 2025 12:09:14 GMT |
| Etag | "d22c28dd9da320f2b299adb1953fb50d" |
| Last-Modified | Tue, 15 Aug 2023 16:50:26 GMT |
| Server | AmazonS3 |

*Figure 13*[89]

221. The script for this data request shows that Amplitude transmits data to third-party servers regarding the medical information the user is viewing in the Portal (i.e., "mychart/app/test-results").

222. Furthermore, Amplitude tracks the user's identity by assigning an identifier to the user's device (i.e., "ai.user.id") and current web session (i.e., "ai.session.id"), as in the Fig. 14 below:

[89] This screenshot was taken on the Portal (emphasis added).

2cs0N07MkVK","ai.session.id":"OU7txl2vil6hhToUiCeXw3","ai.device.id":"browser","ai.device.type":"Browser","a
operation.name":"/mychart/app/test-results","ai.operation.id":"9b56e8268bbe465297848e1dcb0c4d05","ai.in
rnal.sdkVersion":"javascript:2.8.18"},"data":{"baseType":"RemoteDependencyData","baseData":{"id":"|9b56e826
bbe465297848e1dcb0c4d05.03df5f893dca4c5c.","ver":2,"name":"POST /mychart/api/onboarding/GetOnboar
ngPages","resultCode":"200","duration":"00:00:00.127","success":true,"data":"POST /mychart/api/onboarding/
etOnboardingPages","target":"mychartwa.providence.org","type":"Fetch","properties":{"HttpMethod":"POS
T"},"measurements":{}}}},{"time":"2025-11-20T20:55:59.690Z","iKey":"b4d3b40d-80c3-456c-8aa3-c6f57a3c926
5","name":"Microsoft.ApplicationInsights.b4d3b40d80c3456c8aa3c6f57a3c9265.RemoteDependency","tags":
{"ai.user.id":"fCLQWeaZRqV2cs0N07MkVK","ai.session.id":"OU7txl2vil6hhToUiCeXw3","ai.device.id":"browser",
i.device.type":"Browser","ai.operation.name":"/mychart/app/test-results","ai.operation.id":"9b56e8268bbe465
97848e1dcb0c4d05","ai.internal.sdkVersion":"javascript:2.8.18"},"data":{"baseType":"RemoteDependencyDat
a","baseData":{"id":"|9b56e8268bbe465297848e1dcb0c4d05.8546f368144c478d.","ver":2,"name":"GET /mycha
t/ProxySwitch?noCache=0.8402246918166484","resultCode":"200","duration":"00:00:00.109","success":true,"d
ta":"GET /mychart/ProxySwitch?noCache=0.8402246918166484","target":"mychartwa.providence.org","typ
e":"Ajax","properties":{"HttpMethod":"GET"},"measurements":{}}}},{"time":"2025-11-20T20:55:59.660Z","iKey":"
4d3b40d-80c3-456c-8aa3-c6f57a3c9265","name":"Microsoft.ApplicationInsights.b4d3b40d80c3456c8aa3c6f5
a3c9265.RemoteDependency","tags":{"ai.user.id":"fCLQWeaZRqV2cs0N07MkVK","ai.session.id":"OU7txl2vil6hh
oUiCeXw3","ai.device.id":"browser","ai.device.type":"Browser","ai.operation.name":"/mychart/app/test-result
s","ai.operation.id":"9b56e8268bbe465297848e1dcb0c4d05","ai.internal.sdkVersion":"javascript:2.8.18"},"data"
{"baseType":"RemoteDependencyData","baseData":{"id":"|9b56e8268bbe465297848e1dcb0c4d05.1dd63e9e7
ca4cd9.","ver":2,"name":"POST /mychart/api/test-results/GetCommunityInfo","resultCode":"200","duration":"0
0:00:00.202","success":true,"data":"POST /mychart/api/test-results/GetCommunityInfo","target":"mychartwa.p
ovidence.org","type":"Fetch","properties":{"HttpMethod":"POST"},"measurements":{}}}},{"time":"2025-11-20T2
55:59.687Z","iKey":"b4d3b40d-80c3-456c-8aa3-c6f57a3c9265","name":"Microsoft.ApplicationInsights.b4d3b4
d80c3456c8aa3c6f57a3c9265.RemoteDependency","tags":{"ai.user.id":"fCLQWeaZRqV2cs0N07MkVK","ai.sessi
n.id":"OU7txl2vil6hhToUiCeXw3","ai.device.id":"browser","ai.device.type":"Browser","ai.o eration.name":"/myc

*Figure 14*[90]

223. A similar request occurs when a patient searches for nearby pharmacies. Fig. 15. As shown below, Amplitude assigns the patient an ai.user.id, allowing tracking of a patient's pharmacy information on Defendant's Portal through multiple sessions.

[90] This screenshot was taken on the Portal (emphasis added).

Headers Payload Preview Response Initiator Timing

licationInsights.b4d3b40d80c3456c8aa3c6f57a3c9265.RemoteDependency","tags":{"ai.user.id":"fCLQWeaZ
2cs0N07MkVK","ai.session.id":"OU7txl2vil6hhToUiCeXw3","ai.device.id":"browser","ai.device.type":"Browser
operation.name":"/mychart/Clinical/PreferredPharmacies","ai.operation.id":"670b577c0b8347109dc52107
0954","ai.internal.sdkVersion":"javascript:2.8.18"},"data":{"baseType":"RemoteDependencyData","baseData"
d":"|670b577c0b8347109dc521072b130954.83fe21c898ad4fab.","ver":2,"name":"GET https://sr-client-cfg.a
tude.com/config/e3847938e39e75c4a28432cc658fed2d?config_group=browser","resultCode":"200","dura
n":"00:00:00.094","success":true,"data":"GET https://sr-client-cfg.amplitude.com/config/e3847938e39e75c
432cc658fed2d?config_group=browser","target":"sr-client-cfg.amplitude.com","type":"Fetch","properties":
pMethod":"GET"},"measurements":{}}}},{"time":"2025-11-20T20:58:40.337Z","iKey":"b4d3b40d-80c3-456c-8
c6f57a3c9265","name":"Microsoft.ApplicationInsights.b4d3b40d80c3456c8aa3c6f57a3c9265.Event","tags":
user.id":"fCLQWeaZRqV2cs0N07MkVK","ai.session.id":"OU7txl2vil6hhToUiCeXw3","ai.device.id":"browser","
vice.type":"Browser","ai.operation.name":"/mychart/Clinical/PreferredPharmacies","ai.operation.id":"670b5
b8347109dc521072b130954","ai.internal.sdkVersion":"javascript:2.8.18"},"data":{"baseType":"EventData","b
ata":{"ver":2,"name":"Skipping Access MyChart button auto-click","properties":{"url":"https://mychartwa.pr
ence.org/mychart/Clinical/PreferredPharmacies?navFrom=0"},"measurements":{}}}},{"time":"2025-11-20T2
40.664Z","iKey":"b4d3b40d-80c3-456c-8aa3-c6f57a3c9265","name":"Microsoft.ApplicationInsights.b4d3b4
0c3456c8aa3c6f57a3c9265.Pageview","tags":{"ai.user.id":"fCLQWeaZRqV2cs0N07MkVK","ai.session.id":"OU
2vil6hhToUiCeXw3","ai.device.id":"browser","ai.device.type":"Browser","ai.operation.name":"/mychart/Clinic
referredPharmacies","ai.operation.id":"670b577c0b8347109dc521072b130954","ai.internal.sdkVersion":"jav
pt:2.8.18","ai.internal.snippet":"5","ai.internal.sdkSrc":"cdn1"},"data":{"baseType":"PageviewData","baseData
er":2,"name":"MyChart - Manage My Pharmacies","url":"https://mychartwa.providence.org/mychart/Clinica
eferredPharmacies?navFrom=0","duration":"00:00:01.898","properties":{"refUri":"https://mychartwa.provid
org/mychart/Clinical/Medications"},"measurements":{},"id":"670b577c0b8347109dc521072b130954"}}},{"ti
e":"2025-11-20T20:58:40.666Z","iKey":"b4d3b40d-80c3-456c-8aa3-c6f57a3c9265","name":"Microsoft.Appl

*Figure 15*[91]

### D. Defendant Embedded Kameleoon's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portal

1. Kameleoon as a Tracking Vendor

224. Defendant embedded the Tracking Technologies of Third-Party Vendor Kameleoon within the Portal, enabling the interception and collection of patients' private data and communications, without patients' consent. As part of this

[91] This screenshot was taken on the Portal (emphasis added).

interception and collection of patients' private data and communications, Kameleoon obtains the IP address of every individual who used Defendants' Website and patient portal, including Plaintiffs'.

225. Kameleoon is a multinational AI-powered marketing platform offering A/B testing (showing two different versions of a webpage to see which one works better), web feature management (controlling what parts of a website are turned on or off for patients), and real-time personalization (changing content immediately based on a patient's activity).[92]

226. On its webpage dedicated to "HIPAA-compliant" personalization tools, titled "Kameleoon for Healthcare," Kameleoon encourages customers to "[o]ptimize the ways you collect critical information to connect more patients with providers."[93]

227. Similarly, on its personalization platform, Kameleoon dictates that "[w]hen a visitor lands on [the customer's] website, the algorithm analyzes their behavior, calculates a conversion probability and uses this to display the most suitable experience."[94] This process purportedly enables customers to "segment [their] audience and thus increase the value of each visitor[.]"[95] In other words, Kameleoon studies patients' activity on the Website in real time for commercial gain.

---

[92] *Homepage*, KAMELEOON, https://www.kameleoon.com/ [https://perma.cc/XL9L-K3TF].
[93] *Kameleoon for Healthcare*, KAMELEOON, https://www.kameleoon.com/sector/healthcare [https://perma.cc/MMU5-FZMX].
[94] *What is personalization for marketing?*, KAMELEOON https://www.kameleoon.com/personalization [https://perma.cc/T8XM-P5K4].
[95] *Id.*

228. Unbeknownst to patients, Kameleoon also intercepts private medical data.

2. <u>Tracking on Public-Facing Website</u>

229. On the public-facing website, when a patient researches nearby emergency medicine providers, Kameleoon sends a request embedded within a JavaScript code, transmitting the patient's private medical information to third-party servers:




*Figure 16*[96]

3. <u>Tracking on Portal Entry, Subpages, and Unique Identifiers</u>

230. As soon as the patient enters their login credentials and accesses the Portal, Kameleoon executes a similar request:




*Figure 17*[97]

---

[96] This screenshot was taken as a patient searched for urgent care locations on the public-facing website (providence.org) (emphasis added).
[97] This screenshot was taken on the Portal landing page (emphasis added).

231. As demonstrated in the above Fig. 17, Kameleoon begins building a patient profile *before* the patient takes any action within the purportedly secure Portal.

232. Even when Kameleoon itself does not execute the request, it embeds cookies in the requests of other third-party vendors assigning the patient a persistent identifier and collecting and transmitting their geographic location and metrics associated with their browsing session:




*Figure 18*[98]

233. As shown in the above Fig. 18, Kameleoon uses its Tracking Technologies to surreptitiously collect and transmit information such as precise geographic coordinates (*see* 'Longitude' and 'Latitude' in the above screenshot), session identifiers (*see* 'MyChart_Session=vnb…'), and patient identifiers (*see*

---

[98] This screenshot was taken on the Portal landing page (redacted for client confidentiality) (emphasis added).

kameleoonVisitorCode=a7d....') to build patient profiles that persist across their browsing sessions within the Portal and across the Internet.

### E. Defendant Enables Google's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portal

#### 1. Google as a Tracking Vendor

234. Defendant embedded the Tracking Technologies of Third-Party Vendor Google within the Portal, enabling the interception and collection of patients' private data and communications, including health-related queries, without patients' consent. As part of this interception and collection of patients' private data and communications, Google obtains the IP address of every individual who used Defendants' Website and patient portal, including Plaintiffs'.

235. Google, headquartered in Mountain View, California, provides a Google Analytics platform designed to track customers "across devices and platforms" to "understand the customer journey and improve marketing ROI."[99]

236. Google Analytics boasts the ability to provide data insights to "discover new and predictive insights from your data — such as which users are likely to purchase or churn."[100]

---

[99] *Get Essential Customer Insights*, GOOGLE MARKETING PLATFORM, https://marketingplatform.google.com/about/analytics/ [https://perma.cc/7CR3-ZJ6A].

[100] *Get a Complete View*, GOOGLE MARKETING PLATFORM, https://marketingplatform.google.com/about/analytics/benefits/ [https://perma.cc/3SM8-7D9G].

2. Tracking on Portal Entry, Subpages, and Unique Identifiers

237. Defendant's website embeds Google Analytics software, which collects and sends to Google patients' confidential medical information, both from Defendant's public-facing Website and within the supposedly secure Portal.

238. For example, when a patient reviews allergy information within the Portal (specifically, "mychartwa.providence.org/mychart/Clinical/Allergies") and clicks the "Learn more" button, the patient is unknowingly redirected to "providenceportalib.staywellsolutionsonline.com." Once the patient navigates to this subpage, Google Analytics begins tracking the patient's medical information (in this case, an allergy to penicillin, as shown below). Fig. 19.




*Figure 19*[101]

[101] This screenshot was taken after being redirected from the Portal onto the public-facing page of the Website (emphasis added).

239. A similar data transaction occurs when the patient uses the Portal to review upcoming potential medical procedures (in this case, a Shingles vaccine). Once again, the patient is unknowingly redirected out of the Portal to "providenceportalib.staywellsolutionsonline.com," a publicly accessible subpage of the Website. On this subpage, Google Analytics collects and transmits information regarding the patients' medical inquiry (note the traffic stating "Shingles Vaccine" below). Fig. 20.




*Figure 20*[102]

[102] This screenshot was taken after being redirected from the Portal onto the public-facing page of the Website (emphasis added).

240. Similar data transmissions occur on Defendant's Website when patients leave, without any warning or notice, the "Health Issues" subpage of Defendant's Portal when clicking a link to "Learn More" about a specific medical condition.

241. Fig. 21 shows Google Analytics collecting data about a patient's potential tobacco dependency while Fig. 22 shows Google Analytics collecting data about a potential case of chronic iridocyclitis.

| Request URL | https://www.google-analytics.com/g/collect?v=2&tid=G-D45XSXJD51&gtm=45je5bi1v9123715108za200&_p=1763672912947&gcd=13l3l3l3l2l1&npa=0&dma=0&ul=en-us&sr=1920x1080&cid=1886080938.1763672675&uaa=x86&uab=64&uafvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.176%7CNot_A%2520Brand%3B99.0.0.0&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&frm=0&pscdl=noapi&_eu=ABAIAAQ&_s=1&tag_exp=103116026~103200004~104527906~104528500~104684208~104684211~105322304~115583767~115938465~115938468~116184927~116184929~116217636~116217638&dl=https%3A%2F%2Fprovidenceportalib.staywellsolutionsonline.com%2Finfobutton%2Fsearch.pg%3FmainSearchCriteria.v.cs%3D2.16.840.1.113883.6.90%26mainSearchCriteria.v.c%3DF17.200%26mainSearchCriteria.v.dn%3DTobacco%2Bdependence%2Bsyndrome%26informationRecipient.languageCode.c%3Den%26performer.languageCode.c%3Den%26age.v.v%3D64%26patientPerson.administrativeGenderCode.c%3DM&dp=%2Finfobutton%2Fsearch.pg%3FmainSearchCriteria.v.cs%3D2.16.840.1.113883.6.90%26mainSearchCriteria.v.c%3DF17.200%26mainSearchCriteria.v.dn%3DTobacco%2Bdependence%2Bsyndrome%26informationRecipient.languageCode.c%3Den%26performer.languageCode.c%3Den%26age.v.v%3D64%26patientPerson.administrativeGenderCode.c%3DM&dt=Infobutton&sid=1763672674&sct=1&seg=1&_tu=wAQ&en=page_view&_ee=1&tfd=6085 |
| --- | --- |

*Figure 21*[103]

[103] This screenshot was taken on the "Learn More" subpage of the Portal related to this condition (emphasis added).

| | |
|---|---|
| Request URL | https://www.google-analytics.com/g/collect?v=2&tid=G-D45XSXJD51&gtm=45je5bi1v9123715108za200&_p=1763673007005&gcd=13l3l3l3l2l1&npa=0&dma=0&ul=en-us&sr=1920x1080&cid=1886080938.1763672675&uaa=x86&uab=64&uafvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.176%7CNot_A%2520Brand%3B99.0.0.0&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&frm=0&pscdl=noapi&_eu=ABAIAAQ&_s=1&tag_exp=103116026~103200004~104527906~104528500~104684208~104684211~105322304~115583767~115616985~115938465~115938468~116184927~116184929~116217636~116217638~116474638&dl=https%3A%2F%2Fprovidenceportalib.staywellsolutionsonline.com%2Finfobutton%2Fsearch.pg%3FmainSearchCriteria.v.cs%3D2.16.840.1.113883.6.90%26mainSearchCriteria.v.c%3DH20.11%26mainSearchCriteria.v.dn%3DChronic%2Biridocyclitis%252C%2Bright%26informationRecipient.languageCode.c%3Den%26performer.languageCode.c%3Den%26age.v.v%3D64%26patientPerson.administrativeGenderCode.c%3DM&dp=%2Finfobutton%2Fsearch.pg%3FmainSearchCriteria.v.cs%3D2.16.840.1.113883.6.90%26mainSearchCriteria.v.c%3DH20.11%26mainSearchCriteria.v.dn%3DChronic%2Biridocyclitis%252C%2Bright%26informationRecipient.languageCode.c%3Den%26performer.languageCode.c%3Den%26age.v.v%3D64%26patientPerson.administrativeGenderCode.c%3DM&dt=Infobutton&sid=1763672674&sct=1&seg=1&_tu=wAQ&en=page_view&_ee=1&tfd=6100 |
| Request Method | POST |
| Status Code | 204 No Content |
| Remote Address | 172.217.5.14:443 |
| Referrer Policy | strict-origin-when-cross-origin |

*Figure 22*[104]

## V. Plaintiffs Did Not Consent to Defendant's Interception, Harvesting, and Collection of Their Personal Heath Data

### A. Defendant Does Not Obtain Consent Prior to Surreptitiously Harvesting the Private Heath Data of Patients

242. Defendant's Website provides a privacy policy ("Privacy Policy") with a "Use and disclosure of personal information" section in which it explicitly promises to "not disclose any personal information obtained through the Providence site for any third party marketing purposes":

[104] This screenshot was taken on the "Learn More" subpage of the Portal related to this condition (emphasis added).

Providence collects and uses personal information subject to this Privacy Policy as follows:

- Providence will not intentionally collect any personal information subject to this Privacy Policy about any person under the age of 13. You acknowledge that you must be 13 years or older to provide personal information to Providence through the Providence Web sites, and you represent that you are 13 years or older if you do so.
- Providence will not disclose any personal information obtained through the Providence site for any third party marketing purposes.
- Providence will not collect or use personal information about your use of the Services to obtain educational information, news, information about Providence services, activities and classes, or career or employment opportunities, to make decisions about insurance underwriting or coverage, medical care or treatment, or administration of health care for individuals. Providence will not use such information to infer or make any determinations about an individual's health condition or medical needs. Providence may use personal information collected during your registration for myProvidence, or provided by you in communicating with Providence about your myProvidence account, to administer your My Providence account.
- Providence may use personal information collected during registration for Providence services, activities or classes, to administer such services, activities or classes.
- Providence may make personal information available to third-party service providers for the purpose of providing interactive tools and services to you, such as artificial intelligence driven chat.
- Information provided by individuals participating in User Forums and Message Boards will not be collected or stored as part of insurance or medical records or used to make decisions about insurance underwriting or coverage, medical care or treatment, or administration of health care for any individual. Providence will not use this information to infer or make any determinations about an individual's health condition or medical needs.
- Providence will disclose personal information when required to do so by law, for example, in response to a court order or a subpoena or other legal obligation, in response to a law enforcement agency's request, or in special cases when we have reason to believe that disclosing this information is necessary to identify, contact or bring legal action against someone who may be causing injury to or interference (either intentionally or unintentionally) with our rights or property.

*Figure 23*[105]

243. However, in an adjacent section of the Privacy Policy, labeled "Third-party advertising partners," Defendant admits that it sends "information about Plaintiffs' use of the Website" and "about [Plaintiffs'] interactions with our Web site through the use of these technologies" to "third-party service providers":

## 5. Third-party advertising partners

In addition to using cookies and related technologies as described above, we use third-party service providers to serve interest-based advertisements for Providence products and services across the Internet. These service providers may collect non-identifiable information about your interactions with our Web site through the use of these technologies. In the course of serving these advertisements, these third party companies may place or recognize a unique cookie on your computer, and may record information to these cookies based upon your activities on any of our sites and/or services and on third-party websites. Each of these companies uses this cookie information according to their own privacy and security policies. If you do not wish to have this information used for the purpose of serving you interest-based advertisements, then you may opt-out as indicated below. Please note that you will continue to receive generic advertisements. If you would like more information about this practice and to know your choices for not having this information used by third-party service providers for this purpose, please visit thenai.org/opt-out.

*Figure 24*[106]

105 *Terms of Use & Privacy Policy*, PROVIDENCE HEALTH, https://www.providence.org/utility-pages/privacy-policy [https://perma.cc/BF8F-RCRL].

106 *Id.*

244. On the same page of the Privacy Policy, Defendant states that it is "committed to honoring the privacy of individuals who choose to use the Providence Web sites," while noting it wants to "help" Plaintiffs to "make informed decisions about sharing personal information":

Providence Health & Services (called "Providence" in this Privacy Policy) is committed to honoring the privacy of individuals who choose to use the Providence Web sites. This Privacy Policy is intended to make you aware of the ways your personal information collected through the Providence sites is used and to explain to you how we collect and use your personal information. We hope this policy will help you make informed decisions about sharing personal information with us.

*Figure 25*[107]

245. These representations led patients like Plaintiffs to reasonably believe that Defendant does not share or disclose sensitive health-related information or Website Communications to third parties without *express* authorization.

**B. Unlawful Interception of Plaintiffs' Website Communications**

246. In reality, Tracking Technologies on Defendant's Website begin intercepting Website Communications immediately upon the loading of Defendant's Website:

[107] *Id.*




*Figure 26*[108]



| | |
|---|---|
| Request URL | https://66rc0hx2cf.kameleoon.eu/engine.js |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 104.18.28.63:443 |
| Referrer Policy | strict-origin-when-cross-origin |
| ▼ Response Headers | |
| Age | 1429 |
| Alt-Svc | h3=":443"; ma=86400 |
| Cache-Control | max-age=3600, s-maxage=5400 |
| Cdn-Cache-Control | max-age=5400; public; stale-if-error=604800; stale-while-revalidate=604800 |
| Cf-Cache-Status | HIT |
| Cf-Ray | 9b7badc2798c7815-ORD |
| Content-Encoding | br |
| Content-Type | application/javascript; charset=utf-8 |
| Date | Fri, 02 Jan 2026 16:37:02 GMT |
| Etag | W/"6952ee56-45b2d" |
| Expires | Fri, 02 Jan 2026 16:48:45 GMT |
| Last-Modified | Mon, 29 Dec 2025 21:10:46 GMT |
| Server | cloudflare |
| Strict-Transport-Security | max-age=31536000; includeSubDomains; preload |
| Vary | Accept-Encoding |

*Figure 27*[109]

[108] *Providence: World-class health care with human connection*, PROVIDENCE HEALTH, https://www.providence.org/ [https://perma.cc/3BR8-C7C4].
[109] *Id.*

247. Defendant's Website does not display a pop-up, banner, or consent prompt when patients begin interacting with provider searches or other health-related features.

248. Defendant's Website does not present any privacy policy in a conspicuous or easily accessible location before Defendant begins tracking and data collection.

249. Instead, the Privacy Policy is buried in the footer of the homepage in a section entitled "Terms of Use & Privacy Policy."

250. Plaintiffs did not know that Tracking Technologies were being used on Defendant's Website, particularly not inside the secure Portal.

251. When patients navigate to Defendant's Website, they are not presented with any notification or alert regarding the sensitive health-related data collected by Tracking Technologies.

252. Such notifications, which may be referred to as "pop-up" or "clickwrap" agreements, require a website user to affirmatively consent to their data being collected, often by selecting an option stating, "I agree," which Defendant's Website does not have.

253. In contrast to a conspicuous pop-up or notification, the Privacy Policy on Defendant's Website is in the bottom of a menu in the footer along with many other options, including a "Notice of Privacy Practices":




*Figure 28*[110]

254. The hyperlink to Defendant's Privacy Policy is written in the same size and font as the surrounding text, including non-hyperlinked text. There is nothing about the text itself that indicates it is hyperlinked text.

255. Once a patient has located the "Notice of Privacy Practices" link at the bottom of Defendant's Website and clicks on it, the patient needs to scroll through several language options to select a PDF in "English."

256. The English option opens a page with a 16-page PDF[111] that gives the false impression that Tracking Technologies are *not* being used as it is not listed as a use or disclosure:

---

[110] *Id.*

[111] *Notice of Privacy Practices*, PROVIDENCE HEALTH (Apr. 1, 2021), https://www.provid ence.org/-/media/project/psjh/providence/socal/files/notice-of-privacy-practices/nopp-english.pdf?rev=847e1a90000345b2b867706b4cac25a0&hash=054D6E6AD08C69861EAD87510604A894 [https://perma.cc/QA3K-S9RL].

**Our Uses and Disclosures**

We may use and share information about you as we:

- Treat you
- Operate our organization
- Bill for your services
- Help with public health and safety issues
- Conduct research
- Comply with the law

Effective date: April 1, 2021

- Respond to organ and tissue donation requests
- Work with a medical examiner or funeral director
- Address workers' compensation, law enforcement, and other government requests
- Respond to lawsuits and legal actions

*Figure 29*[112]

257. The "Notice of Privacy Practices" further purports to inform patients about *all* of the ways in which their information, data, or searches may be disclosed; that expressly does *not* include sharing information for marketing purposes:

[112] *Id.*

In these cases, we *never* share information about you unless you give us written permission:

- Marketing purposes (to the extent that an activity is defined as "marketing" under a federal health information privacy law called the Health Insurance Portability and Accountability Act or otherwise known as "HIPAA")
- Sale of information about you (to the extent that an activity is defined as a "sale of protected health information" under HIPAA)
- Most sharing of psychotherapy notes

*Figure 30*[113]

258. Later in the document, an "Our Responsibilities" section simply reads, in its entirety, as follows:

**Our Responsibilities**

- **We are required by law to maintain the privacy and security of health information about you.**
- **We will let you know promptly if a breach occurs that is likely to have compromised the privacy or security of information about you.**
- **We must follow the duties and privacy practices described in this notice.**
- **We will not use or share information about you other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind.**

*Figure 31*[114]

259. Defendant does not disclose anywhere the identity of any of the Third-Party Vendors.

[113] *Id.*
[114] *Id.*

260. Defendant instead states the following in the "Third-party advertising partners" section of its Privacy Policy.[115] Fig. 32.

## 5. Third-party advertising partners

In addition to using cookies and related technologies as described above, we use third-party service providers to serve interest-based advertisements for Providence products and services across the Internet. These service providers may collect non-identifiable information about your interactions with our Web site through the use of these technologies. In the course of serving these advertisements, these third party companies may place or recognize a unique cookie on your computer, and may record information to these cookies based upon your activities on any of our sites and/or services and on third-party websites. Each of these companies uses this cookie information according to their own privacy and security policies. If you do not wish to have this information used for the purpose of serving you interest-based advertisements, then you may opt-out as indicated below. Please note that you will continue to receive generic advertisements. If you would like more information about this practice and to know your choices for not having this information used by third-party service providers for this purpose, please visit thenai.org/opt-out.

Some Internet browsers include the ability to transmit "Do Not Track" signals. As uniform standards have not been adopted, we do not currently respond to browser "do not track" signals. For more information regarding "Do Not Track", please visit "All About Do Not Track."

*Figure 32*[116]

261. While this section suggests that patients may "opt-out" of certain data-sharing practices (i.e., tracking), it does not identify any mechanism by which patients can opt out of tracking by the Third-Party Vendors.

262. In reality, no such opt-out exists. Patients are offered only a limited option to restrict the disclosure of their medical information to other health care providers, not to prevent the Third-Party Vendors from tracking private medical information for marketing purposes.[117]

---

115 *Terms of Use & Privacy Policy*, PROVIDENCE HEALTH, https://www.providence.org/utility-pages/privacy-policy [https://perma.cc/BF8F-RCRL].
116 *Terms of Use & Privacy Policy*, PROVIDENCE HEALTH, https://www.providence.org/utility-pages/privacy-policy [https://perma.cc/BF8F-RCRL].
117 *For Patients: FAQ*, PROVIDENCE HEALTH, https://www.provshare.org/health-information-exchange/for-patients/ [https://perma.cc/4AWC-MXSU].

263. By conflating these distinct concepts, the Website falsely implies that patients can opt out of tracking by the Third-Party Vendors when, in fact, Defendant provides no tool or setting that allows patients to do so.

264. Additionally, these disclosures are not presented at the point of data collection, such as when a patient begins typing sensitive medical information.

265. Patients are not prompted for consent prior to browsing Defendant's Website; they are wiretapped from the moment they load the site,[118] regardless of whether they eventually navigate to, download, read, or understand the disclosures in the privacy notice.

266. At no point does Defendant seek affirmative consent from patients prior to the initiation of data tracking.

267. Valid consent to interception must be actual, informed, and voluntary.

268. In sum, the privacy language on Defendant's Website is structured to deflect attention from the scope of impermissible, unlawful data collection by making misleading general disclosures and requiring scrolling through (and putting together) the information on several pages. The Website provides no complete disclosure about the sharing of queries and sensitive information with third parties and no way to opt out of data sharing.

---

[118] *Javier v. Assur. IQ, LLC*, No. 21-16351, 2022 U.S. App. LEXIS 14951, at *5 (9th Cir. May 31, 2022) (retroactive consent is not consent for digital wiretapping).

269. Patients like Plaintiffs, who reasonably expect confidentiality on a portal-based, secure health care website, are unaware that their keystrokes, searches, and clicks are being intercepted in real time.

270. Defendant's deceptive practice fall far short of obtaining actual, informed, and voluntary consent.

271. In light of the above, Plaintiffs did not consent to Defendant's interception and collection of their Website Communications.

**C. Defendant's Conduct Violates HIPAA's Privacy Rules**

272. Because Defendant is a health care provider, patients have an elevated expectation that their Website activity will remain private and secure.

273. Relatedly, courts and regulators have recognized that health-related data warrants elevated privacy protections due to its sensitivity and the risk of misuse.

274. HIPAA's enhanced protections for health-related data support the conclusion that Plaintiffs had a reasonable expectation of privacy in interacting with Defendant's Website.

275. HIPAA prohibits covered entities like Defendant from using or disclosing PHI for purposes such as marketing, analytics, or other transmissions to third parties, unless the individual has provided a valid, written authorization. *See* 45 C.F.R. § 164.508(a)(3).

276. A valid HIPAA authorization must be written, specific, and signed by the individual. It must identify the data to be used or disclosed, the recipient, and the purpose of disclosure. *See* 45 C.F.R. § 164.508(c)(1)(i)–(vi).

277. Defendant's integration of Tracking Technologies on its pages results in the automatic and unauthorized transmission of sensitive health-related data of the patients of Defendant to third parties that include the Third-Party Vendors.

278. The information Defendant obtains and discloses from patients, including Plaintiffs, includes information like IP addresses, which is individually identifiable health information ("IIHI") as defined by HIPAA. *See* 45 C.F.R. § 164.514.

279. At no point did Defendant obtain HIPAA-compliant written authorizations from such patients before the transmissions occurred.

280. The Privacy Policy does not come close to providing the specificity, clarity, or accessibility required to satisfy HIPAA's notice and authorization requirements.

281. Defendant's failure to transparently disclose its data practices violates the principle, as expressed in HIPAA's requirements, *supra*, that individuals must be given control over their health information and be empowered to authorize or reject such disclosures.

282. By covertly transmitting patients' interactions related to health services to third parties without authorization, Defendant failed to meet the

heightened duty of care owed to entities in possession of sensitive health information, as memorialized in HIPAA's statutory and regulatory regime.

283. Defendant failed in its core health care obligations as a health care provider by prioritizing marketing analytics and commercial gain over patient privacy.

**D. The Applicable Statutes of Limitation Are Tolled**

284. None of the Plaintiffs were aware that their private health data were being intercepted and sent to the Third-Party Vendors.

285. None of the Plaintiffs consented to Defendant and the Third-Party Vendors intercepting their private health data.

286. Plaintiffs could not have, despite full diligence, discovered the full scope of Defendant's conduct as alleged herein.

287. Accordingly, the applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the full scope of its use of these Tracking Technologies.

288. Defendant was under a duty to disclose the nature and extent of its data collection practices but did not do so.

289. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

290. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of a putative class of the following similarly situated individuals (collectively, the "Class"):

> Every current and former patient of Defendant whose Website Communications were captured from March 20, 2024, through the date of the judgment, through the use of Tracking Technologies embedded in Defendant's Website, www.providence.org, subpages, and Defendant's MyChart portal.

291. **Numerosity:** The Class includes thousands of people, such that it is not practicable to join all class members into one lawsuit.

292. **Commonality:** This case presents questions of law and fact that are common to the Class, including:

- Whether Defendant intercepts and transmits to Third-Party Vendors the Website Communications of patients;
- Whether Defendant intentionally disclosed the intercepted Website Communications of its patients;
- Whether Defendant acquired the contents of patients' Website Communications without their consent;
- Whether Defendant's conduct violates FWA and Oregon common law;
- Whether Plaintiffs and Class members are entitled to equitable relief; and

- Whether Plaintiffs and Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

293. **Typicality:** Plaintiffs, Class members, and Defendant have a commonality of interest in the subject matter of the lawsuit and the remedy sought.

294. **Predominance:** The common questions of law and fact predominate over any individual issue that may arise on behalf of an individual Class member.

295. **Superiority:** A class action is the appropriate vehicle for fair and efficient adjudication of the claims of Plaintiffs and Class members because if individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardship to the Class, to the Court, and to Defendant.

296. **Adequacy of representation:** Plaintiffs and counsel will fairly and adequately protect the interests of Class members. Plaintiffs' counsel, Schlichter Bogard, will fairly and adequately represent the interests of the Class. Schlichter Bogard has a well-documented track record of successfully serving as class counsel in this Circuit and elsewhere. Schlichter Bogard's pioneering work in class actions has been covered by numerous national publications, including the New York Times and Wall Street Journal, among other media outlets.

297. Schlichter Bogard has been widely recognized by federal judges across the United States as pioneers in fiduciary breach class action litigation. Schlichter

Bogard's vast experience in this area is reflected by the firm's appointment as class counsel in over 30 fiduciary breach class actions.

298. Federal judges have repeatedly recognized that Schlichter Bogard's efforts and successful outcomes have led to "enormous" savings for class members. *E.g.*, *Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-GBD, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021).

299. Schlichter Bogard has handled, and repeatedly prevailed in, fiduciary breach class action litigation in the U.S. Supreme Court. For example, in *Tibble v. Edison International*, a landmark fiduciary breach class action handled by Schlichter Bogard, after a partial loss in the U.S. District Court for the Central District of California, which was upheld by the U.S. Court of Appeals for the Ninth Circuit, Schlichter Bogard achieved a reversal before the Supreme Court of the United States. The Supreme Court's vacatur in favor of the plaintiffs was unanimous. *Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).

300. Schlichter Bogard secured a reversal of a dismissal before the U.S. Supreme Court, again in a unanimous decision, in *Hughes v. Northwestern University* – another fiduciary breach class action. *Hughes v. Nw. Univ.*, 595 U.S. 170 (2022).

301. In *Cunningham v. Cornell University*, Schlichter Bogard again achieved a unanimous victory in the U.S. Supreme Court. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 695 (2025).

302. Other courts have repeatedly heralded Schlichter Bogard's work in class action litigation, particularly in the Ninth Circuit. By way of limited example:

303. In *Munro v. University of Southern California*, the Central District of California expressly found that Schlichter Bogard demonstrated "considerable experience litigating similar class actions" and had achieved a "favorable result" only after "extensive discovery and motion practice." Order Granting Pls.' Mot. for Final Approval of Class Action Settlement & Mot. for Attys' Fees at 13–17, *Munro v. Univ. of S. Cal.*, No. 16-6191 (C.D. Cal. Aug. 24, 2023), ECF No. 384. The firm's work was of such high quality that it warranted an upward departure from the original benchmark for attorneys' fees. *Id.* at 14. The Court further recognized that the firm assumed extraordinary litigation risk by prosecuting that case on full contingency for six years, during which it advanced more than one million dollars in expenses with no guarantee of recovery. *Id.*

304. In *Kanawi v. Bechtel Corp.*, the Northern District of California specifically found that, "Class Counsel obtained quality results." Order Awarding Attys' Fees and Costs at 3, No. 06-5566 (N.D. Cal. Mar. 1, 2011), ECF No. 828. In likewise approving an upward departure from the benchmark for attorneys' fees, the Court further found that, "Class Counsel assumed a good deal of risk in bringing this suit against highly sophisticated parties," and acknowledged that "Class Counsel had to turn down opportunities to work on other cases to devote the appropriate amount of time, resources, and energy necessary to handle this relatively complex case." *Id.* at 3–4.

305. In another two companion cases in the Central District of California involving the retirement plans of Northrop Grumman that resulted in millions of dollars in recovery to plan participants, courts were impressed by Schlichter Bogard's ability to persist in the face of obstacles, noting that, "[The firm] devoted over 26,000 hours of attorney, paralegal, and law clerk time over the approximately eleven years the action has been pending." *Waldbeuser v. Northrop Grumman Corp.*, Order Granting Attys' Fees, Reimbursement of Expenses and Incentive Awards at 5, No. 06-6213, ECF No. 803 (C.D. Cal. Oct. 24, 2017).

306. Additionally, the *Waldbeuser* court found that, "[Schlichter Bogard] is highly experienced in representing plaintiffs in class action litigation." *Id.* at 6; *see also Marshall v. Northrop Grumman Corp.*, Order Granting In Part Plaintiffs' Motion for Attys' Fees at 4, ECF No. 378 (C.D. Cal. Sep. 18, 2020) ("[S]ettlement fund obtained by Schlichter, Bogard [] is an exceptional result for the Class.").

307. Another U.S. district judge found as follows: "Class Counsel performed substantial work . . . investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the [class]." *Will v. General Dynamics*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *8–9 (S.D. Ill. Nov. 22, 2010).

308. Other findings by U.S. district judges in relation to Schlichter Bogard's work include the following: "Schlichter, Bogard [] has achieved unparalleled results

on behalf of its clients, . . . has invested . . . massive resources and persevered in the face of . . . enormous risks[.]" *Nolte v. Cigna*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622, at *8 (C.D. Ill. Oct. 15, 2013).

309. "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014).

310. "Schlichter, Bogard [] demonstrated extraordinary skill and determination in obtaining this result for the Class." *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *9 (S.D. Ill. July 17, 2015).

## CAUSES OF ACTION

### COUNT I – VIOLATION OF FEDERAL WIRETAP ACT
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

311. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

312. The FWA gives a private right of action to anyone whose communications are intercepted, disclosed, or used in violation of the statute. 18 U.S.C. § 2520(a).

313. The FWA, as amended by the ECPA, prohibits any person from intentionally intercepting, disclosing, or using the contents of any wire, oral, or electronic communication without consent or as otherwise permitted by law.

314. The FWA, as amended by the ECPA, extended wiretap protections to digital transmissions like those alleged herein.

315. Plaintiffs' interactions and Website Communications with Defendant's Website are "electronic communications" under 18 U.S.C. § 2510(12), and the information they contain constitutes "contents" under 18 U.S.C. § 2510(8).

316. Defendant, through tracking code embedded on its Website, intentionally intercepted these Website Communications and they were disclosed, to the Third-Party Vendors without Plaintiffs' knowledge or valid consent.

317. Plaintiffs' Website Communications were transmitted to the Third-Party Vendors in real time, simultaneously with their transmission to Defendant.

318. Any alleged one-party consent by Defendant is invalid because Defendant committed a federal crime of "knowingly" disclosing "individually identifiable health information" to third parties. 42 U.S.C. § 1320d–6(a),

319. Any alleged one-party consent by Defendant is invalid because Defendant committed torts as outlined herein like intrusion upon seclusion.

320. As a result, the consent exception is void under the FWA and Defendant is liable for damages. 18 U.S.C. § 2511(2)(d).

321. Plaintiffs request the relief set forth in the Request for Relief below.

**COUNT II – BREACH OF CONFIDENCE**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

322. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

323. As a covered entity under HIPAA and the Plaintiffs' health care provider, Defendant had a duty to maintain the confidentiality and privacy of Plaintiffs' personal health information, including the Website Communications made on Defendant's Website.[119]

324. Defendant likewise had a fiduciary duty, under Oregon law, to ensure the confidentiality of patient data, including ORS §§ 192.553–192.581 (requiring reasonable safeguards to protect medical information and notice of a breach involving medical information); ORS §§ 192.518–192.530 (guaranteeing a patient's right to access of their medical records and requiring providers to maintain their

[119] 145 C.F.R. § 164.502 (uses and disclosures of protected health information).

confidentiality and security); and ORS § 743.045 , which mandate that medical records and patient data be treated as confidential.

325. Furthermore, as the Oregon Supreme Court has recognized, "A physician's duty to keep medical and related information about a patient in confidence is beyond question. It is imposed by statute."[120]

326. Defendant's duty extended to ensuring that any collection, use, or sharing of personal health information was done only with the specific informed consent of the individual from whom the information was collected.[121]

327. At all relevant times, a relationship existed between Plaintiffs and Defendant, in which Plaintiffs entrusted Defendant to protect the private and personal health information of Plaintiffs and members of the putative class, and Defendant accepted that trust.[122]

328. Defendant breached the duty of confidence that it owed to Plaintiffs and the putative class by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, or intentionally disclosing, this private and personal health information, while deliberately concealing its breaches from Plaintiffs.[123]

---

[120] *Humphers v. First Interstate Bank*, 298 Or. 706, 720–21 (1985).
[121] *Id.*
[122] "The gravamen of the tort of breach of confidentiality, in Oregon and nationally, is the affirmative disclosure of information by a person to whom the confidential information has been entrusted." *Stevens v. First Interstate Bank*, 167 Or. App. 280, 286 (2000).
[123] *Id.*; *see also A.B. v. Or. Clinic*, 321 Or. App. 60, 70 (2022) (analyzing an Oregon breach of confidence claim where the parties agreed that the duty of confidentiality arose from HIPAA and ORS §§ 192.553-81).

329. Defendant's actions in enabling the interception and transmission of Plaintiffs' sensitive health information without informed consent constitutes a breach of the duty of confidence that Defendant owes to the Plaintiffs under Oregon law.

330. Defendant breached its fiduciary duty by also failing to uphold its express promise not to use any information of Plaintiffs for "third-party marketing."[124]

331. As a direct result of Defendant's actions, Plaintiffs have suffered harm, including but not limited to the unauthorized disclosure of their highly sensitive health information, the risk of identity theft, and other potential damage arising from the unauthorized collection and sharing of personal health data.

332. Plaintiffs request the relief set forth in the Request for Relief below.

**COUNT III – INTRUSION UPON SECLUSION**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

333. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

334. Under Oregon law, the tort of intrusion upon seclusion occurs when there is "(1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's

---

[124] *Terms of Use & Privacy Policy*, PROVIDENCE HEALTH, https://www.providence.org/utility-pages/privacy-policy [https://perma.cc/BF8F-RCRL].

solitude or seclusion or private affairs or concerns, (3) which would be highly offensive."[125]

335. Plaintiffs had a reasonable expectation of privacy in their interactions with Defendant's Website, including in their search queries and page visits relating to their personal conditions and potential treatments.

336. Plaintiffs had a specific right enshrined by HIPAA and Oregon statutes protecting the confidentiality of medical records to keep medical information private.

337. Because Defendant's portal required login with usernames and passwords and represented itself as a secure health care tool, Plaintiffs' expectation of privacy was strong.

338. Defendant's Website purports to offer secure access to health information.

339. However, without Plaintiffs' knowledge or consent, Defendant embedded Tracking Technologies (including those from Third-Party Vendors) on the Website to record and transmit Website Communications in real time.

340. Defendant deliberately intruded into Plaintiffs' private affairs, in a way that a reasonable person would find highly offensive, especially given that Defendant failed to disclose the extent of the Tracking Technologies and even had representations that patients' information would remain confidential.

---

[125] *Reed v. Toyota Motor Credit Corp.*, 301 Or. App. 825, 830–31 (2020), citing *Mauri v. Smith*, 324 Or. 476, 482 (1996).

341. Defendant intercepted and transmitted data in an inarguably private domain: Plaintiffs' health-related decisions and conditions inside a purportedly secure portal.

342. In so doing, Defendant egregiously violated Oregon's privacy norms and legal protections.

343. As a direct and proximate result of Defendant's actions, Plaintiffs suffered and continue to suffer injuries, including loss of privacy, exposure to increased risk of identity theft, and loss of control over their private data.

344. Plaintiffs request the relief set forth in the Request for Relief below.

**COUNT IV – UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

345. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

346. Under Oregon law, unjust enrichment occurs when (1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it.[126] Defendant obtained a significant financial benefit by covertly collecting, using, and sharing the personal health-related data of Plaintiffs with third parties, including the Third-Party Vendors, without consent.

---

[126] *Cron v. Zimmer*, 255 Or. App. 114, 130, 296 P.3d 567 (2013); *see also Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 124–31, 404 P.3d 912 (2017) (discussing Oregon's unjust enrichment framework).

347. Defendant has been unjustly enriched by using this sensitive health information, which has enormous value, to generate profits through targeted advertising and the sale or use of the data by third parties, including the Third-Party Vendors.

348. By collecting and transmitting these data without providing adequate notice or obtaining informed consent, Defendant exploited the private health information of Plaintiffs for illicit financial gain, in violation of principles of fairness and equity.

349. In contrast, Plaintiffs have suffered harm, including the loss of privacy and the potential for identity theft.

350. Defendant's conduct is inequitable because it is unfair for a business associate of a covered entity, who owes a fiduciary duty to protect the privacy and confidentiality of patients' health data, to harvest and profit from that information without consent.

351. The benefits that Defendant derived from Plaintiffs rightly belong to Plaintiffs as it is their private health information.

352. It would be inequitable for Defendant to retain profits or other benefits derived from the unlawful practices alleged herein.[127]

---

[127] *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–600 (9th Cir. 2020) (concluding that the plaintiffs adequately alleged an unjust enrichment claim under California law even where the plaintiff did not suffer a corresponding loss because, under the circumstances, as between the plaintiffs and Facebook, it was adequately alleged that it was unjust for Facebook to retain profits from the plaintiffs' personal data).

353. Defendant should be compelled to disgorge all unlawful or inequitable proceeds received as a result of the conduct alleged herein.

## REQUEST FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, request judgment against Defendant as follows:

A. Certifying this case as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class counsel for the Class;

B. Finding that Defendant's conduct violates the FWA and Oregon Common Law;

C. Awarding actual damages caused by Defendant's violations of FWA and Oregon Common Law;

D. Awarding statutory damages as provided under 18 U.S.C. § 2520, including the greater of $10,000 or $100 per day for each violation of the FWA;

E. Awarding compensatory damages, restitution, disgorgement, attorneys' fees and costs, and/or punitive damages as permitted by law and as the Court deems just and proper;

F. Entering equitable relief enjoining Defendant from engaging in the misuse and/or disclosure of Plaintiffs' and Class members' data, and the issuance of prompt, complete and accurate disclosures to Plaintiffs, Class members, and all current and future users of the Website;

G. Entering equitable relief requiring restitution and disgorgement of any profits wrongfully obtained as a result of Defendant's wrongful conduct;

H. Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

I. Awarding such other and further relief as this Court deems appropriate and as equity and justice may require.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, request trial by jury of all claims asserted herein.

Dated: May 29, 2026

Respectfully submitted,

s/ Andrew D. Schlichter
Andrew D. Schlichter (*pro hac vice*)
Alexander L. Braitberg (*pro hac vice*)
Chen Kasher (*pro hac vice*)
Cort VanOstran (*pro hac vice*)
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-5934 (fax)
aschlichter@uselaws.com
abraitberg@uselaws.com
ckasher@uselaws.com
cvanostran@uselaws.com
*Lead Counsel for Plaintiffs*

Paul Bovarnick, Bar No. 791654
ROSE, SENDERS, & BOVARNICK LLC
1205 N.W. 25th Ave.
Portland, OR 97210
(503) 227-2486
pbovarnick@rsblaw.net
*Local Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of May 2026, a true and correct copy of the foregoing document was filed via the Court's CM/ECF filing system and will be available to all counsel of record upon their appearance.

s/ Andrew D. Schlichter
Andrew D. Schlichter