David B. Schwartz (*pro hac vice*)
david.schwartz@arnoldporter.com
Jami Vibbert (*pro hac vice*)
jami.vibbert@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: 212-836-8000

Jason Ross, OSB No. 231074
jason.ross@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202-942-5000

Daniel E. Raymond (*pro hac vice*)
daniel.raymond@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
300 N. LaSalle Dr.
Suite 3500
Chicago, IL 60654
Tel: 312-583-2379

*Attorneys for Defendant Providence Health & Services*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| DEBRA MCCLELLAN, ELIZABETH JEAN BRADY, REBECCA MAJOR, ANTHONY OMER, LASHANTE TAYLOR, and LISA EBNER, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>PROVIDENCE HEALTH & SERVICES,<br><br>*Defendant*. | Case No. 3:26-cv-00540-AR<br><br>**DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>ORAL ARGUMENT REQUESTED |

## LR 7-1 CERTIFICATION

In compliance with L.R. 7-1, counsel for Defendant Providence Health & Services ("Providence") certifies that the parties met and conferred in good faith through a telephone conference but were unable to resolve the disputes at issue in this motion.

## MOTION

Providence respectfully requests the Court dismiss Plaintiffs' Amended Class Action Allegation Complaint ("Amended Complaint") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). This Motion is supported by the following memorandum of points and authorities and the concurrently filed Request for Judicial Notice.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 2

LEGAL STANDARD .......... 4

ARGUMENT .......... 4

I. PLAINTIFFS CONSENTED TO THE ALLEGED DATA PRACTICES, WHICH BARS ALL CLAIMS. .......... 4

A. Plaintiffs Agreed to Providence's Privacy Policy and Terms. .......... 5

B. The Privacy Policy Expressly Discloses the Very Data Practices Plaintiffs Challenge. .......... 8

II. PLAINTIFFS' ECPA CLAIM (COUNT I) SHOULD BE DISMISSED. .......... 10

A. As a Party to the Communications, Providence Is Exempt From Liability. .......... 10

B. The Crime-Tort Exception Does Not Apply Here. .......... 11

*1. Plaintiffs Fail to Plead Any Criminal or Tortious Purpose or a Crime or Tort Independent of the Alleged Interception.* .......... 12

*2. Plaintiffs Fail to Plead a Criminal Violation of HIPAA.* .......... 15

a. Plaintiffs Fail to Plead Disclosure of IIHI From Any Source .......... 15

b. Plaintiffs' Conclusory IP-Address Allegations Fail to Plead Disclosure of IIHI. .......... 18

c. Even if There Was a Disclosure of IIHI, It Was to Business Associates and Thus Compliant With HIPAA .......... 19

C. Plaintiffs Fail to Plausibly Allege any Interception of "Contents" of Electronic Communications. .......... 20

III. PLAINTIFFS' COMMON LAW CLAIMS (COUNTS II-IV) SHOULD BE DISMISSED. .......... 22

A. Plaintiffs' Breach of Confidence Claim (Count II) Fails. .......... 22

B. Plaintiffs' Intrusion Upon Seclusion Claim (Count III) Fails. .......... 23

C. Plaintiffs' Unjust Enrichment Claim (Count IV) Fails. .......... 25

CONCLUSION .......... 27

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A. B. v. Or. Clinic*,
321 Or. App. 60 (2022)....................22

*Adair v. Cigna Corp. Servs., LLC*,
818 F. Supp. 3d 641 (E.D. Pa. 2026)....................4

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024)....................15, 18

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988)....................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................4

*Atencio v. TuneCore, Inc.*,
843 F. App'x 42 (9th Cir. 2021)....................8

*B.K. v. Eisenhower Med. Ctr.*,
721 F.Supp.3d 1056 (C.D. Cal. 2024)....................12, 18, 26

*B.N. v. Or. Reprod. Med., LLC*,
No. 3:25-cv-00202-IM, 2025 WL 3165965 (D. Or. Nov. 12, 2025)....................18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................4

*Cron v. Zimmer*,
255 Or. App. 114 (2013)....................5, 25

*Cumming v. Nipping*,
310 Or. App. 780 (2021)....................25, 26

*Doe v. Kaiser Found. Health Plan, Inc.*,
No. 23-cv-02865-EMC, 2024 WL 1589982 (N.D. Cal. Apr. 11, 2024)....................13, 14

*Easterbrook v. LinkedIn Corp.*,
No. 6:22-cv-01108-MC, 2023 WL 3022497 (D. Or. Apr. 20, 2023)....................26

*Gutierrez v. Converse Inc.*,
2023 WL 8939221 (C.D. Cal. Oct. 27, 2023)....................21

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................24

*Humphers v. First Interstate Bank of Or.*,
298 Or. 706 (1985) ....................5, 22, 23

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................13

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ....................10

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....................20, 21

*Karwowski v. Gen Digit., Inc.*,
No. 24-7213, 2025 WL 3002610 (9th Cir. Oct. 27, 2025) ....................10

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ....................6

*Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*,
616 F.3d 963 (9th Cir. 2010) ....................27

*Larisa's Home Care, LLC v. Nichols-Shields*,
362 Or. 115 (2017) ....................25

*Leggett v. First Interstate Bank of Or., N.A.*,
86 Or. App. 523 (1987) ....................5

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................24

*M.R. v. Salem Health Hosps. & Clinics*,
No. 6:23-cv-01691-AA, 2024 WL 3970796 (D. Or. Aug. 28, 2024) ....................22, 23

*Martell v. Gen. Motors LLC*,
492 F. Supp. 3d 1131 (D. Or. 2020) ....................25

*Mauri v. Smith*,
324 Or. 476 (1996) ....................23

*McAllister Constr. Co. v. Liu*,
343 Or. App. 53 (2025) ....................26

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ....................6, 8

*Nichols v. Peacehealth Networks on Demand LLC*,
No. 2:25-cv-01831-JHC, 2026 WL 607763 (W.D. Wash. Mar. 4, 2026) ....................10

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024)....................11, 14

*Nienaber v. Overlake Hosp. Med. Ctr.*,
No. 2:23-cv-01159-TL, 2025 WL 692097 (W.D. Wash. Mar. 4, 2025)....................11

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ....................6

*Okash v. Essentia Health*,
No. 23-482, 2024 WL 1285779 (D. Minn. Mar. 26, 2024) ....................14

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022) ....................12

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ....................24

*Reddy v. Litton Indus., Inc.*,
912 F.2d 291 (9th Cir. 1990) ....................27

*Silver v. Stripe Inc.*,
No. 4:20-cv-08196-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021) ....................6, 7

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ....................4, 17

*Stevens v. First Interstate Bank of Cal.*,
167 Or. App. 280 (2000)....................5, 22

*Sussman v. Am. Broad. Cos., Inc.*,
186 F.3d 1200 (9th Cir. 1999) ....................12

*T.D. v. Piedmont Healthcare, Inc.*,
No. 1:23-cv-05416-TWT, 2024 WL 3972984 (N.D. Ga. Aug. 28, 2024)....................11

*Weston v. Lefiti*,
No. 24-541, 2024 WL 4579237 (9th Cir. Oct. 25, 2024) ....................14

*Winters v. County of Clatsop*,
210 Or. App. 417 (2007)....................25

**Statutes**

18 U.S.C. § 2510(8) ....................20

18 U.S.C. § 2511(1)(a)....................9

18 U.S.C. § 2511(2)(d) ....................5, 10, 11, 12

42 U.S.C. § 1320d–6(a) ....................14

42 U.S.C. § 1320d–6(a)(3)....................14

42 U.S.C. § 1320d(6) ....................15

**Other Authorities**

45 C.F.R. § 164.502(e)(1)(i) ....................19

Fed. R. Civ. P. 8(d) ....................25

Fed. R. Civ. P. 12(b)(6)....................2, 4, 6

## INTRODUCTION

Plaintiffs' Amended Complaint, like its predecessor, still mistakes volume for substance. It devotes tens of thousands of words to the mechanics of website analytics tools; reproduces screenshots of HTTP request headers, JavaScript code, and metadata; and offers page after page on the internet's tracking ecosystem and precious little to Plaintiffs' activities. As re-pled, this case is still about purported ***generic*** capabilities of ubiquitous online tools, not about any actual action of or harm to any Plaintiff. At best, the handful of new and revised allegations describe only what information certain Plaintiffs viewed on publicly-available pages of Providence's website (the "Website") and inside the MyChart patient portal (the "Portal"). The new allegations do not sufficiently allege that communications or sensitive identifiable information (e.g., name, email address, medical record number, or date of birth) was transmitted to the four alleged third-party vendors (the "Third Party Vendors"). As with its predecessor, the Amended Complaint should be dismissed in its entirety.

*First*, Plaintiffs consented to Providence's data practices as disclosed in Providence's privacy policy, which bars all claims. The Website and Portal are subject to and governed by Providence's Terms of Use ("Terms") and privacy policy ("Privacy Policy"), a fact Plaintiffs acknowledge by quoting and reproducing them in the Amended Complaint. The Privacy Policy expressly discloses the precise data practices they now challenge. Specifically, the Privacy Policy discloses that Providence will use third-party advertising partners to serve interest-based advertisements, including through the use of information collected through cookies. That is a plain-language description of the very conduct Plaintiffs label "surreptitious" and "unauthorized." Plaintiffs allege they had actual knowledge of the Privacy Policy and affirmatively rely on the parties' agreement to the integrated Terms and Privacy Policy to establish this Court's jurisdiction

and venue. In addition, Plaintiffs allege they accessed and used the Portal and, to do so, must have checked a box consenting to the Privacy Policy during their account creation.

*Second*, Plaintiffs' wiretap claim (under the Electronic Communications Privacy Act ("ECPA")) fails because Providence is a party to the communications at issue, the exception to this (i.e., the crime-tort exception) does not apply, and Plaintiffs have not alleged that Providence intercepted the "contents" of electronic communications.

*Third*, the state-law claims for breach of confidence, intrusion upon seclusion, and unjust enrichment each fail because Plaintiffs' consent negates any breach of confidence or privacy and the Complaint's conclusory allegations cannot satisfy the elements of any claim.

Plaintiffs have now had two opportunities to plead their case, along with a detailed roadmap of their pleading's deficiencies. Because no further amendment could cure these defects, Plaintiffs should not be given a third opportunity, and the Amended Complaint should be dismissed in its entirety and with prejudice.

## FACTUAL BACKGROUND

Providence is a nonprofit health system operating more than 50 hospitals and 1,000 clinics. Am. Compl. ¶¶ 57–58 & n.1. Providence maintains the publicly facing Website and separately the password-protected Portal. *Id.* ¶¶ 7, 184. The Portal requires login credentials and, once authenticated, allows patients to access test results, communicate with providers, pay bills, and review visit summaries. *Id.* ¶ 185. The Website and Portal are governed by Providence's Terms and Privacy Policy. *See id.* ¶¶ 65–68, 242–45, 260–62. Accessing the Portal requires creating an account, during which each user must click a box confirming that they have "read, understand, and agree to the **Privacy Policy** and the **Terms of Use**," where "Privacy Policy" and "Terms of Use" are in blue lettering set against a white background and hyperlinked to the Privacy Policy and Terms. *See* Providence's Request for Judicial Notice ("RJN"), Ex. 2.

The Amended Complaint identifies four Third-Party Vendors whose technologies are allegedly embedded on the Website: (1) Tealium, a tag management platform that helps websites organize and control analytics tools, Am. Compl. ¶¶ 196–200; (2) Amplitude, an analytics platform offering product analytics and session replay services, *id.* ¶¶ 215–17; (3) Kameleoon, an A/B testing and personalization platform, *id.* ¶¶ 224–27; and (4) Google, whose Google Analytics software helps websites understand the customer journey, *id.* ¶¶ 234–36. None of these Third-Party Vendors is a party to this action.

The Amended Complaint reproduces extensive portions of the Privacy Policy, which, in a section entitled "Third-party advertising partners," discloses that Providence uses "cookies and related technologies" and "third-party service providers to serve interest-based advertisements for Providence products and services across the Internet." *Id.* ¶¶ 243, 260, Fig. 24, Fig. 32. The Privacy Policy further explains that these service providers "may collect non-identifiable information about your interactions with our Web site through the use of these technologies," "may place or recognize a unique cookie on your computer," and "may record information to these cookies based upon your activities on any of our sites and/or services and on third-party websites." *Id.* ¶ 243, Fig. 24. The Privacy Policy provides an express opt-out mechanism, directing users who "do not wish to have this information used for the purpose of serving you interest-based advertisements" to opt out at thenai.org/opt-out and acknowledging Do Not Track browser signals. *Id*. No Plaintiff alleges that they opted out or used any browser-based tool to limit tracking. *See generally id.* ¶¶ 242–71.

The Amended Complaint names six Plaintiffs. Each is an alleged user of the Portal and as such had to agree that they read, understood, and accepted the Privacy Policy when they created their accounts. *See* RJN, Ex. 2. Nevertheless, Plaintiffs bring state and federal claims challenging the very data practices to which they consented. Their individualized allegations appear at

paragraphs 36 through 56 of the Amended Complaint and are addressed Plaintiff-by-Plaintiff in Section II.B.1 below. In brief: Plaintiffs McClellan, Taylor, and Ebner allege only that they "used" the Website and Portal for various purposes (Am. Compl. ¶¶ 36, 44–47, 55–56); Plaintiff Brady additionally alleges that she clicked a "Learn More" link concerning a "digestion condition" (*id.* ¶¶ 39–43); Plaintiff Omer additionally alleges that Figures 19–22 "reflect" his browsing and a "search for an eye condition," through clicking on a "Learn More" link (*id.* ¶¶ 37–38; ¶¶ 238–41 & nn. 101–04); and Plaintiff Major additionally alleges that her use of the Website generated "network traffic" to a Tealium domain (*id.* ¶¶ 48–54). No Plaintiff alleges that their name, email address, medical record number, or date of birth was transmitted to anyone as a result of the Website browsing and Portal activities alleged. *See generally*, Am. Compl.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," nor "unwarranted deductions of fact." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, 990 (9th Cir. 2001) (internal citations omitted).

## ARGUMENT

### I. PLAINTIFFS CONSENTED TO THE ALLEGED DATA PRACTICES, WHICH BARS ALL CLAIMS.

Plaintiffs' claims are foreclosed by their consent to the use of tracking technologies and

cookies expressly disclosed in the Privacy Policy. ECPA exempts from liability any interception where "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). This includes consent based upon a defendant's website privacy policy, as applicable here. *See* *Adair v. Cigna Corp. Servs., LLC*, 818 F. Supp. 3d 641, 671 (E.D. Pa. 2026) (granting motion to dismiss because "Plaintiffs agreed to Defendants' Privacy Notice in addition to their Terms of Use, thereby giving Defendants permission to use the third-party tracking technologies . . . [This] consent is dispositive of Plaintiffs' ECPA . . . and invasion of privacy claims."). Plaintiffs' consent to Providence's disclosed data practices is equally fatal to their remaining state common law claims for breach of confidence (Count II), intrusion upon seclusion (Count III), and unjust enrichment (Count IV).[1]

### A. Plaintiffs Agreed to Providence's Privacy Policy and Terms.

Plaintiffs' allegations demonstrate that they consented to Providence's Terms and Privacy

---

[1] For breach of confidence, the Oregon Supreme Court, in first recognizing the tort, framed it as the "*unauthorized* and unprivileged disclosure of confidential information obtained in a confidential relationship." *Humphers v. First Interstate Bank of Or.*, 298 Or. 706, 717 (1985) (emphasis added). Oregon appellate courts have likewise held that the "gravamen" of the tort is the "the *affirmative disclosure* of information by a person to whom the confidential information has been *entrusted*." *Stevens v. First Interstate Bank of Cal.*, 167 Or. App. 280, 286 (2000) (second emphasis added). Plaintiffs' consent authorized the disclosures that underlie their claim, and information shared with consent to disclose it to third parties is not "entrusted" within the meaning of the tort.

For intrusion upon seclusion, under Oregon law, "*lack* of consent is an element of the tort, and there is no actionable invasion of privacy if the plaintiff has consented, the consent has not been revoked and the defendant has acted within the scope of the consent." *Leggett v. First Interstate Bank of Or., N.A.*, 86 Or. App. 523, 528 (1987).

Unjust enrichment under Oregon law requires: "(1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Cron v. Zimmer*, 255 Or. App. 114, 130 (2013). Where, as here, plaintiffs knowingly convey information to a defendant under terms disclosed by the defendant and consented to by plaintiffs, retention is not "unjust"—it is exactly what the parties agreed to.

Policy. Plaintiffs' Amended Complaint extensively cites, quotes, and relies upon Providence's Terms and Privacy Policy. *See* Am. Compl. ¶¶ 65–68, 242–45, 260–62. The Terms and the Privacy Policy are not two separate documents. They are published together on the same webpage, at the same URL, under the unified heading "Terms of Use & Privacy Policy." *Id.* ¶ 249; *see also id.* ¶¶ 65 & n.9, 66 & n.10, 242–44 & nn.105–07, 260 & nn.115–16 (citing the identical URL—https://www.providence.org/utility-pages/privacy-policy—for both the Terms provisions and the Privacy Policy provisions); *see* RJN, Ex. 1.[2]

The Ninth Circuit has held that the enforceability of an online agreement depends on whether the website provides "reasonably conspicuous notice" of its terms and whether the user takes some action that constitutes "an unambiguous manifestation of assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 514 (9th Cir. 2023); *see* *Silver v. Stripe Inc.*, No. 4:20-cv-08196-YGR, 2021 WL 3191752, at *3 (N.D. Cal. July 28, 2021) (same standard to find agreement to privacy policy). Where the user has *actual knowledge* of the terms, rather than merely constructive notice, continuing to use the service can constitute a manifestation of assent. *See* *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (distinguishing between cases where users had "actual notice of the agreement" and those involving mere constructive notice).

Here, Plaintiffs agreed to be bound by the Terms and Privacy Policy. Plaintiffs allege they accessed and used the Portal and, to do so, all must have checked a box acknowledging that they "read, understand, and agree to the **Privacy Policy** and the **Terms of Use**," where "Privacy Policy"

---

[2] Because Plaintiffs' claims are "necessarily" founded upon these documents, the Terms and Privacy Policy are incorporated by reference into the Complaint and may be considered on a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Accordingly, the Court can and should consider the Terms and Privacy Policy in full—including their express disclosures of the very third party tracking practices at issue in the Complaint—in evaluating this motion. *See* RJN at 1–2.

and "Terms of Use" are in blue lettering set against a white background and hyperlinked to the Privacy Policy and Terms. *See* RJN, Ex. 2. They thus received reasonably conspicuous notice of the Terms and Privacy Policy and, by clicking the box, unambiguously consented to them. *See* *Oberstein*, 60 F.4th at 515–16 (finding enforceable agreement from user clicking "confirmation button" on sign in page with language directly above stating: "[b]y continuing past this page, you agree to the Terms of Use," where "Terms of Use" appeared in blue text and linked to terms); *Silver*, 2021 WL 3191752, at *3 (same where "hyperlink to the privacy policy is displayed in a bright green font against a white background . . . located close to the 'place order' button").

Confirming this reality, the Amended Complaint affirmatively ***invokes*** the Terms and Privacy Policy. Specifically, Plaintiffs rely on the Terms' forum-selection clause to establish that "[j]urisdiction and venue for any dispute arising from or pertaining to these Terms of Use shall be in … the U.S. District Court for the District of Oregon." Am. Compl. ¶ 66. Plaintiffs likewise rely on the Terms' choice-of-law provision to establish that "state law issues shall be exclusively interpreted according to the laws of the State of Oregon." *Id.* And Plaintiffs quote extensively from the Privacy Policy's substantive disclosure provisions, reproducing block quotations from its "Use and disclosure of personal information" and "Third-party advertising partners" sections. *Id.* ¶¶ 242–44, 260. By invoking the Terms and Privacy Policy for jurisdiction and venue and quoting these documents extensively, Plaintiffs acknowledge they agreed to the terms of the Terms and Privacy Policy. Having alleged that the Terms and Privacy Policy are binding for purposes of forum and choice of law, Plaintiffs have admitted that they are bound by the entirety of the agreements.

Critically, despite complaints that links to the Terms and Privacy Policy are purportedly "buried in the footer" of the homepage, *see id.* ¶ 249, Plaintiffs allege that they had ***actual***

***knowledge*** of the Privacy Policy. Plaintiffs make conclusory allegations that general statements in the Privacy Policy about Providence's commitments to privacy are somehow contradictory to specific, actual disclosures of the practices at issue here. *See, e.g.*, *id.* ¶¶ 244–45. In doing so, Plaintiffs admit that they had actual knowledge of the Privacy Policy. *See id.* ¶ 245 (alleging that certain "representations [in the Privacy Policy] ***led patients like Plaintiffs*** to reasonably believe that Defendant does not share or disclose sensitive health-related information or Website Communications to third parties without *express* authorization") (first emphasis added). Because Plaintiffs had actual knowledge of the Privacy Policy, the Court can and should determine that their continued use of the Website and Portal constituted constructive consent to the data privacy practices described therein. *See* *Nguyen*, 763 F.3d at 1176.

Simply put, by invoking the Terms and Privacy Policy in the Amended Complaint, Plaintiffs have admitted their consent to the data practices disclosed therein. *See, e.g.*, *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."); *Atencio v. TuneCore, Inc.*, 843 F. App'x 42, 44 (9th Cir. 2021) (same).

### B. The Privacy Policy Expressly Discloses the Very Data Practices Plaintiffs Challenge.

The very conduct that Plaintiffs characterize as "surreptitious" and "unauthorized" is, in fact, expressly disclosed in plain terms on the face of the Privacy Policy. In a section titled "Third-party advertising partners," the Privacy Policy states:

> In addition to using cookies and related technologies as described above, **we use third-party service providers to serve interest-based advertisements for Providence products and services across the Internet**. These service providers may collect non-identifiable information about your interactions with our Web site through the use of these technologies. **In the course of serving these advertisements, these third party companies may place or recognize a unique cookie on your computer, and may record information to these cookies based**

> **upon your activities on any of our sites and/or services and on third-party websites**.

Am. Compl. ¶ 243, Fig. 24 (emphasis added). This disclosure appears on the very page of the Privacy Policy that Plaintiffs themselves quote in their Amended Complaint. *Id.* ¶¶ 243–44, 260.

The Privacy Policy's disclosures track the conduct alleged in the Amended Complaint: (1) the collection of "information about your interactions with our Web site" through "the use of these technologies"; (2) the placement of "a unique cookie on your computer" by "third party companies"; and (3) the recording of "information to these cookies based upon your activities on any of our sites and/or services and on third-party websites." Am. Compl. ¶ 243, Fig. 24. That is precisely what Plaintiffs allege the "Tracking Technologies" do. *See id.* ¶¶ 9–12, 195–96, 215, 224, 234. The Privacy Policy also expressly provides users with the ability to opt out of interest-based advertising, directing them to visit "thenai.org/opt-out." *Id.* ¶ 243, Fig. 24. No Plaintiff alleges they exercised that opt-out mechanism—or even that they attempted to do so. *See generally* Am. Compl. This further confirms that Providence's data practices were neither concealed nor unconsented to.

In sum, the Amended Complaint establishes that Providence publicly disclosed—in the very Privacy Policy that Plaintiffs quote and rely upon—the collection of website-interaction data through third party tracking technologies and cookies. Plaintiffs allege they accessed and used the Portal and, to do so, must have consented to the Privacy Policy during their account creation; Plaintiffs expressly invoke that Policy in the Amended Complaint; and no Plaintiff alleges having opted out. Plaintiffs' consent to the Privacy Policy is fatal to every claim in this action. Counts I through IV should be dismissed with prejudice as a result.

## II. PLAINTIFFS' ECPA CLAIM (COUNT I) SHOULD BE DISMISSED.

ECPA provides liability against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). To state a claim under the relevant provisions of ECPA, Plaintiffs must plausibly allege facts showing Providence: "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *Nichols v. Peacehealth Networks on Demand LLC*, No. 2:25-cv-01831-JHC, 2026 WL 607763, at *2 (W.D. Wash. Mar. 4, 2026) (quotation marks omitted). ECPA expressly exempts "a party to the communication" from liability. 18 U.S.C. § 2511(2)(d).

Here, Plaintiffs' ECPA claim should be dismissed with prejudice because (A) Providence is exempt from liability as a party to the communications, (B) the crime-tort exception does not apply to these allegations, and (C) Plaintiffs do not plausibly allege Providence intercepted the "contents" of any of Plaintiffs' electronic communications.

### A. As a Party to the Communications, Providence Is Exempt From Liability.

Providence cannot, as a matter of law, be liable under ECPA for "intercepting" Plaintiffs' communications on the Website or Portal because Providence was an intended recipient and, therefore, a party to any such communications. That is, Plaintiffs' communications with the Website and Portal were communications with Providence. Plaintiffs' allegations are in accord. The Amended Complaint defines the purportedly intercepted data as "Website Communications"—i.e., Plaintiffs' "keystrokes (text entered into a search box or information box), web addresses (i.e., 'URLs') of individual pages visited, Internet Protocol (IP) addresses, mouse movements, clicks, and/or other electronic communications" transmitted while interacting with

the Website and Portal. Am. Compl. ¶ 10. These are communications between Plaintiffs and Providence.

ECPA exempts "a party to the communication" from liability. 18 U.S.C. § 2511(2)(d); *see* *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1026 (N.D. Cal. 2014) ("[T]he consent of one party is a complete defense to a[n] [ECPA] claim."). Courts in this Circuit and across the country have consistently held that a website operator, like Providence, is a "party" to the electronic communications that users transmit to its website. *See, e.g.*, *Karwowski v. Gen Digit., Inc.*, No. 24-7213, 2025 WL 3002610, at *1-2 (9th Cir. Oct. 27, 2025) (affirming dismissal of ECPA claim based upon defendant's status as a party to the communications); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1094–96 (W.D. Wash. 2024) (dismissing ECPA claim and holding "[t]o the extent that Plaintiff alleges that Defendant surreptitiously recorded its own communications with Plaintiff, the Court finds that the one-party consent exemption applies"); *Nienaber v. Overlake Hosp. Med. Ctr.*, No. 2:23-cv-01159-TL, 2025 WL 692097, at *12–13 (W.D. Wash. Mar. 4, 2025) (on motion to dismiss second amended complaint, dismissing ECPA claim with prejudice); *T.D. v. Piedmont Healthcare, Inc.*, No. 1:23-cv-05416-TWT, 2024 WL 3972984, at *4 (N.D. Ga. Aug. 28, 2024) (collecting cases and holding that "the weight of persuasive authority in similar pixel tracking cases supports" position that defendant "could not have intercepted the same transmission it received on its website"). Since Providence is a "party to the communication," 18 U.S.C. § 2511(2)(d), Plaintiffs' ECPA claim should be dismissed with prejudice.

**B. The Crime-Tort Exception Does Not Apply Here.**

Anticipating the party exemption, Plaintiffs seek to avail themselves of the "crime-tort exception," which provides that a party to the communication can still be liable if the communication is intercepted "for the purpose of committing any criminal or tortious act." 18

U.S.C. § 2511(2)(d). Plaintiffs conclude that the party exception is "invalid" because Providence allegedly "committed a federal crime of 'knowingly' disclosing 'individually identifiable health information' to third parties" and "committed torts" like "intrusion upon seclusion." Am. Compl. ¶¶ 318–19.

As discussed below, the criminal provision in the Health Insurance Portability and Accountability Act of 1996, as amended, ("HIPAA"), cannot serve as the predicate "crime" because Plaintiffs must show that Providence had a criminal or tortious ***purpose*** at the time of interception and that the intended crime or tort is ***independent*** of the act of interception itself—but Plaintiffs do neither. Additionally, the Amended Complaint does not plausibly allege a violation of HIPAA.[3]

*1. Plaintiffs Fail to Plead Any Criminal or Tortious Purpose or a Crime or Tort Independent of the Alleged Interception.*

To avail themselves of the crime-tort exception, Plaintiffs must plead facts that Providence intercepted communications "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). This statutory text actually creates two independent pleading requirements.

*First,* Plaintiffs must show that the alleged offender had a criminal or tortious purpose at the time of interception. The Ninth Circuit has expressly clarified, on multiple occasions, that "[t]he focus is not upon whether the interception itself violated another law; it is upon whether the *purpose* for the interception—its intended use—was criminal or tortious." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022) (quoting *Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999)). Merely intending to record Plaintiffs' communications is not enough. If, at the moment the interception occurs, the offender does not

[3] Plaintiffs' common law claims cannot serve as predicate torts because consent bars their claims (*see* Section I) and because they fail to adequately allege the requisite elements (*see* Section III).

intend to use the intercepted communications for a ***different*** criminal or tortious purpose, there is no violation of the crime-tort exception. *See* *B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1065–66 (C.D. Cal. 2024) (dismissing ECPA claim because the purpose alleged—commercial advantage—was not "independently illegal or actionable conduct").

Here, Plaintiffs do not allege that Providence intended to commit any crime or tort at the time of the alleged interception. Like a snake eating its tail, Plaintiffs allege in circular and conclusory fashion that "Tracking Technologies load immediately on both public-facing pages of Defendant's Website and within the purportedly secure MyChart portal for the purpose of covertly tracking, intercepting, and recording patients' communications with Defendant." Am. Compl. ¶ 10. That allegation runs headlong into binding Ninth Circuit precedent instructing that "the criminal or tortious purpose must be separate and independent from the" interception itself. *Newman*, 51 F.4th at 1136 ("This criminal or tortious purpose must be separate and independent from the act of recording."). Elsewhere, Plaintiffs allege that Providence embedded the Tracking Technologies "for its own monetary profit." Am. Compl. ¶ 18; *see also id.* at ¶ 11 (vaguely alleging that Providence "use[s] these Website Communications for purposes that benefit and enrich" it). But a desire to profit is not a crime or a tort, and a commercial motive does not supply the qualifying purpose the exception demands. *See, e.g.*, *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (dismissing ECPA claim because defendant's desire to "make money" is not a tortious or criminal intent); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022) ("Multiple courts in this district have found that the crime-tort exception to the Wiretap Act is inapplicable where the defendant's primary motivation was to make money, not to injure plaintiffs tortiously.").

*Second*, Plaintiffs must plead that the intended crime or tort is ***independent*** of the act of interception itself. That is, the "criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits." *Nienaber*, 733 F. Supp. 3d at 1095–96 (quotation marks omitted); *see also id.* at 1096 (holding that crime-tort exception does not apply because "Plaintiff fails to plead a tortious or criminal use of the acquired communications, separate from the recording, interception, or transmission"); *Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-cv-02865-EMC, 2024 WL 1589982, at *10 (N.D. Cal. Apr. 11, 2024) (dismissing ECPA claim because "the act of interception itself cannot be the crime or the tort"). In other words, an ECPA plaintiff must "adequately allege that the interception was done 'for the purpose of facilitating some further impropriety, such as blackmail.'" *Weston v. Lefiti*, No. 24-541, 2024 WL 4579237, at *2 (9th Cir. Oct. 25, 2024) (quoting *Sussman*, 186 F.3d at 1202).

Here, Plaintiffs fail to allege any independent criminal or tortious conduct. The Amended Complaint impermissibly collapses the alleged interception and the supposed predicate offense into the same act. Specifically, Plaintiffs allege that the crime-tort exception applies because Providence committed the federal crime of "knowingly" disclosing IIHI to third parties in violation of 42 U.S.C. § 1320d–6(a) and committed the tort of intrusion upon seclusion. Am. Compl. ¶¶ 318–19. Plaintiffs allege that the "Tracking Technologies" intercepted their "Website Communications" and transmitted them "in real time, simultaneously with their transmission to Defendant." *Id.* ¶¶ 316–17. But these allegations describe only the ***simultaneous*** interception and disclosure of Plaintiffs' information—they are one and the same act as the alleged interception. *See, e.g.*, *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at *10 (dismissing ECPA claim despite alleged HIPAA violation because "knowingly disclos[ing] individually identifiable

health information to third parties without authorization (*i.e.*, by allowing third parties to intercept communications) . . . [was] the act of interception itself [which] cannot be the crime or the tort"); *Okash v. Essentia Health*, No. 23-482, 2024 WL 1285779, at *4–5 (D. Minn. Mar. 26, 2024) (dismissing ECPA claim because allegations that defendant "violated HIPAA and privacy torts encompass only the simultaneous interception and disclosure of information to Meta"). Based on Plaintiffs' own allegations, the crime-tort exception is not applicable.

2. *Plaintiffs Fail to Plead a Criminal Violation of HIPAA.*

Plaintiffs attempt to plead the crime-tort exception based on their bare assertion that Providence violated 42 U.S.C. § 1320d–6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI. Am. Compl. ¶ 318. HIPAA defines IIHI as a subset of "health information" that either "identifies the individual" or "with respect to which there is a reasonable basis to believe the information can be used to identify the individual." 42 U.S.C. § 1320d(6). Both the elements that it is "health information" and that it is "individually identifiable" are necessary. That is, the information must (i) relate to an individual's health condition, provision of care, or payment for care (health information), *and* (ii) identify, or be reasonably usable to identify, the specific individual (individually identifiable information). *Id.* The Amended Complaint's allegations fail to satisfy this standard as to any Plaintiff, whether the data allegedly intercepted originates from (a) Providence's public-facing Website, (b) the authenticated Portal, or (c) public-facing pages to which Portal users were directed.

a. <u>Plaintiffs Fail to Plead Disclosure of IIHI From Any Source</u>

As noted above, to plead a HIPAA criminal violation, Plaintiffs must allege the disclosure of "individually identifiable health information"—information that both "relates to" an individual's health condition and "identifies the individual" or could reasonably be used to do so. 42 U.S.C. § 1320d(6). The Amended Complaint fails to make this showing from any source—

whether the public Website, the Portal, or the redirected public pages that Portal users reach by clicking "Learn More."

*First*, activity on the public-facing Website does not plausibly produce IIHI absent facts showing that the visitor was identified and that the transmitted data related to that person's health condition. This is because the public Website is accessible to any anonymous visitor without authentication or login. Data collected from a user's activity on those pages is not associated with an identified patient. Because there is no identified individual, there is no individually identifiable health information. *See* *Am. Hosp. Ass'n v. Becerra* ("*Becerra*"), 738 F. Supp. 3d 780, 801–04 (N.D. Tex. 2024) ("Without knowing information that's never received [by the website owner]—*i.e.*, the visitor's subjective motive—the resulting metadata could never identify that individual's PHI. Simply put, **Identity** (Person A) + **Query** (Condition B) ≠ **IIHI** (Person A has Condition B)."). Plaintiffs all allege that they "used" or "visited" the Website. Am. Compl. ¶¶ 36-56. Any allegations about general use of the public-facing Website are not sufficient to allege the actual disclosure of IIHI.

*Second*, as to the Portal, the Amended Complaint does not allege that any data from any Plaintiff's Portal session was transmitted to a Third-Party Vendor. Take, for instance, Plaintiffs McClellan, Taylor, and Ebner. They allege various Portal activities, but none alleges facts showing that particular health information from their own sessions was transmitted to any Third Party Vendor. *Id.* ¶ 36 (McClellan), ¶ 45 (Taylor), ¶ 56 (Ebner). And, at best, the other Plaintiffs allege what health information was *displayed to them* inside the Portal. Plaintiff Major, for instance, alleges that "MyChart also displayed Ms. Major's medical conditions and health history, like a neurological condition." *Id.* ¶ 51. She also alleges, generally, activities taken on the Portal, such as managing and accessing health-care related information. *Id.* ¶¶ 49–50. Although Plaintiff Major

alleges network traffic transmitted data to tealiumiq.com, she does not plead facts showing that the neurological condition displayed in the Portal or any of her activities on the Portal were disclosed or that the transmitted data identified her as the person with that condition or who took those actions. *Id.* ¶ 53. Indeed, all the allegations about the specific functionality of Tealium, including the screenshots, are from public pages.

*Third*, the "Learn More" redirect does not bridge the gap. Plaintiff Brady alleges that she reviewed information about a digestion condition "through MyChart's authenticated portal" by clicking a "Learn More" link. *Id.* ¶ 42. But the Amended Complaint itself establishes that clicking "Learn More" takes the user ***out*** of the Portal to a public-facing StayWell Company page (staywellsolutionsonline.com). *Id.* ¶¶ 187–88, Fig. 2. Thus, the alleged tracking occurred, if at all, after Brady navigated away from the Portal to a different hosted page. The Amended Complaint, however, does not allege facts showing that the analytics request from the StayWell page identified Brady or tied the digestion-condition page to her Portal. The activity therefore falls squarely within the public Website analysis above.

*Fourth*, the one Plaintiff, Omer, who attempts to connect specific browsing to specific figures is contradicted by the very figures he provides. Indeed, Plaintiffs say Omer's browsing is reflected in Figures 19–22, but the figures themselves do not identify Omer or show a name, medical-record number, email address, Portal login, or other direct identifier. Plaintiff Omer alleges that Figures 19–22 "reflect[]" his "actual browsing," including a "search for an eye condition." *Id.* ¶¶ 37–38. But by their own explanations and footnotes, Figures 19–22 depict the activity of an unnamed "patient" on public-facing "Learn More" subpages of the StayWell domain—none of which carries Omer's name, email, medical record number, login, or any other identifier connected to him. *See id.* ¶¶ 238–41 & nn. 101–04. The data shown in those figures—a

Google Analytics beacon containing information such as a random cookie number, basic device details, the URL of a public StayWell reference page, and the topic looked up—identifies no one. At most, these allegations show a Google Analytics request associated with a public reference page and limited demographic/device information, not information identifying Omer as the person with an eye condition. *Sprewell*, 266 F.3d at 988 (court need not accept allegations contradicted by documents subject to judicial notice or by exhibit).

This Court has required precisely this kind of connection in analogous pixel-tracking cases. In *K.L. v. Legacy Health*, the claim was permitted to proceed only where the plaintiff identified her specific protected health information available to Google as a result of Google Analytics running on her Patient Portal, such as "prescription information[] and her specific treatment plans from her physical therapists." 2024 WL 4794657, at *5–6. No Plaintiff here comes close to that standard. The Amended Complaint's technical exhibits do not identify any specific health information disclosed to the Third-Party Vendors and are untethered from any Plaintiff's actual experience (apart from the four figures Plaintiffs now assert are Omer's). *See also* *B.N. v. Or. Reprod. Med., LLC*, No. 3:25-cv-00202-IM, 2025 WL 3165965, at *6–7 (D. Or. Nov. 12, 2025) (dismissing ECPA claim where complaint did not "supply facts that connect any disclosure of PHI shared with ORM's Website to LinkedIn"); *B.K.*, 721 F. Supp. 3d at 1064 (dismissing where complaint was "replete with conjectures and hypothetical scenarios and patients" but lacked specificity as to "what medical information was allegedly disclosed or when it was disclosed"). Because no Plaintiff plausibly alleges disclosure of their own IIHI, Plaintiffs cannot plead a HIPAA criminal predicate, and the crime-tort exception fails.

b. Plaintiffs' Conclusory IP-Address Allegations Fail to Plead Disclosure of IIHI.

Recognizing that their plaintiff-specific allegations do not establish disclosure of IIHI, Plaintiffs add a uniform fallback: that the Third Party Vendors "obtain[] the IP address of every individual" who used the Website and Portal, and that an IP address "is individually identifiable health information ('IIHI') as defined by HIPAA." Am. Compl. ¶¶ 206, 215, 224, 234, 278. This allegation founders on the same public/private distinction that defeats their other claims: an IP address transmitted from the public Website is associated with an anonymous visitor, not an identified patient, and carries no health information. Connecting an IP address to a visit to Providence's public Website does not yield IIHI—it yields a device's network address and the fact that someone visited a hospital's website. Courts have rejected precisely this inference. *See* *Becerra*, 738 F. Supp. 3d at 801–04.

More critically, the IP allegations are entirely generic: no Plaintiff alleges their own IP address, alleges that it was transmitted in connection with any specific item of their health information, or ties any figure in the Amended Complaint to an alleged disclosure of their IP address. Because no Plaintiff plausibly alleges disclosure of their own IIHI, Plaintiffs cannot plead a HIPAA criminal predicate, and the crime-tort exception fails.

c. Even if There Was a Disclosure of IIHI, It Was to Business Associates and Thus Compliant With HIPAA

Even if the Amended Complaint adequately alleged that any Plaintiff's IIHI was disclosed to the Third-Party Vendors (it does not), that disclosure still could not supply the predicate "crime" the crime-tort exception requires because a disclosure to a business associate is expressly authorized by HIPAA.

The criminal provision Plaintiffs invoke reaches only a disclosure of IIHI made "knowingly and in violation of" the HIPAA rules. 42 U.S.C. § 1320d–6(a); *see* Am. Compl. ¶ 318. But the Privacy Rule affirmatively permits a covered entity to "disclose protected health

information to a business associate" and to "allow a business associate to create, receive, maintain, or transmit protected health information on its behalf," so long as the covered entity obtains satisfactory assurances—documented in a business associate agreement—that the information will be safeguarded. 45 C.F.R. § 164.502(e)(1)(i); *see id.* §§ 164.502(a), 164.504(e). A "business associate" is, by definition, precisely the kind of Third-Party Vendor that "creates, receives, maintains, or transmits" PHI in performing a function or service for a covered entity, including data analytics and data-transmission services. *Id.* § 160.103.

That is exactly how Plaintiffs describe the Third-Party Vendors: as service providers Providence engaged to "collect," organize, and "send" patient data and to deliver analytics and "personalization" on its behalf. *See* Am. Compl. ¶¶ 197–200, 225–27. Indeed, Plaintiffs affirmatively plead that these Third-Party Vendors are HIPAA-compliant—alleging that Tealium's "Tealium for Healthcare" offering "details HIPAA compliance," *id.* ¶ 199, and that Kameleoon markets "HIPAA-compliant" tools through "Kameleoon for Healthcare," *id.* ¶ 226. The reasonable inference here, based on the actual pleading, is that Kameleoon and Tealium are business associates of Providence. This inference is further supported by the fact that the Amended Complaint never alleges that any Third-Party Vendor lacked a business associate agreement, was not a business associate, or received PHI outside the scope of one. Because Plaintiffs bear the burden to plead a disclosure made "in violation of" HIPAA, and their own allegations establish the opposite, the HIPAA criminal predicate is not adequately pled and cannot sustain the crime-tort exception.

### C. Plaintiffs Fail to Plausibly Allege any Interception of "Contents" of Electronic Communications.

Even if the Court were to find that the Amended Complaint adequately alleges an "interception" and an "electronic communication," Plaintiffs' ECPA claim still fails for an

independent and dispositive reason: the Amended Complaint does not plausibly allege the interception of any "contents" of a communication. The ECPA prohibits only the interception of "contents"—defined as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

The Ninth Circuit has drawn a clear line between "content," which concerns the substance of what is being communicated, and "record information," which concerns the existence, timing, or routing of the communication. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). "[U]nder ECPA, the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *Id.* This distinction is dispositive here.

Not one Plaintiff alleges that any Third-Party Vendor intercepted the substantive ***message*** they sent or received, meaning the actual words typed into a message field, the text of a clinical note, or the specific query entered into a search box. That is what "contents" means under ECPA: "the intended message conveyed by the communication." *Id.* Instead, the Amended Complaint alleges only that Third-Party Vendors collected URLs of pages visited, IP addresses, cookies, device identifiers, and HTTP metadata, *i.e.*, the routing and addressing information that tells a server ***where*** a communication came from and ***where*** it was directed, not ***what*** it said. That is record information, not contents. *See* *Gutierrez v. Converse Inc.*, 2023 WL 8939221, at *3 (C.D. Cal. Oct. 27, 2023) ("'[C]ontents refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message,' such as a party's name or subscriber number, or other miscellaneous information like IP addresses, keystrokes, and pages viewed." (alteration in *Gutierrez*) (quoting *In re Zynga*, 750 F.3d at 1106)).

Plaintiff Omer comes closest, alleging a "search for an eye condition," Am. Compl. ¶ 38, but Omer's own figures show no search query at all. The figures show only an anonymous Google Analytics beacon fired from a public StayWell page, containing a topic label but no text Omer typed. *Id.* Figs. 19-22. The Amended Complaint therefore fails to allege interception of "contents" as to any Plaintiff.

Because the Amended Complaint does not, and cannot, allege that the online tools allegedly employed by Providence intercepted the ***contents*** of any communication, Plaintiffs' ECPA claim fails as a matter of law. 18 U.S.C. § 2510(8).

## III. PLAINTIFFS' COMMON LAW CLAIMS (COUNTS II-IV) SHOULD BE DISMISSED.

Each of Plaintiffs' derivative common law[4] claims merely repackages the same insufficient allegations and the same alleged wrong as their ECPA claim under a different (tort) label. Plaintiffs' common law claims fail as a matter of law because they consented to the data practices they now challenge, as explained in Section I, and for the independent reasons set forth below.

### A. Plaintiffs' Breach of Confidence Claim (Count II) Fails.

To state a claim for breach of confidence under Oregon law, a plaintiff must allege an "unauthorized and unprivileged disclosure of confidential information obtained in a confidential relationship." *Humphers*, 298 Or. at 717. Such a duty, however, "is not determined by 'custom or reasonable expectations'; rather, the 'contours of the asserted duty of confidentiality are

---

[4] Plaintiffs plead each of their state common law claims under Oregon law. *See* Am. Compl. ¶¶ 324–29 (alleging duties owed "under Oregon law" and citing Oregon statutes and Oregon Supreme Court authority for breach of confidence), 334 (invoking the Oregon formulation of intrusion upon seclusion), 346 (citing the Oregon standard for unjust enrichment); *id.* at Request for Relief ¶ B (seeking a finding that Providence's conduct violates "Oregon Common Law"). The Terms, which Plaintiffs invoke as the basis for jurisdiction and venue in this District, independently require the same result: "state law issues shall be exclusively interpreted according to the laws of the State of Oregon, without regard to choice of law principles." *Id.* ¶ 66. Providence accordingly applies Oregon law to the common law claims throughout this motion.

determined by a legal source external to the tort claim itself,' and a plaintiff asserting such a duty 'must identify its source and terms.'" *A. B. v. Or. Clinic*, 321 Or. App. 60, 70 (2022) (quoting *Humphers*, 298 Or. at 718-19). The "gravamen" of the tort is "the *affirmative disclosure* of information by a person to whom the confidential information has been entrusted." *Stevens*, 167 Or. App. at 286.

Count II fails for at least two independent reasons. *First*, for a breach of confidence claim to survive a motion to dismiss, this District has required plaintiff-specific allegations that their personal health information was disclosed. *See* *K.L.*, 2024 WL 4794657, at *4–5, n.10 (allowing breach of confidence claim to proceed where the plaintiff provided evidence of Google Analytics on her own private patient portal, identified her specific protected health information available to Google as a result, and alleged that portal and public website data combined to produce targeted advertising); *M.R. v. Salem Health Hosps. & Clinics*, No. 6:23-cv-01691-AA, 2024 WL 3970796, at *4 (D. Or. Aug. 28, 2024) (allowing breach of confidence claim to proceed where plaintiff identified six specific categories of PHI disclosed). As discussed in Section II, the Amended Complaint does not identify any confidential health information belonging to any Plaintiff that was disclosed to the Third-Party Vendors. *Second*, even if there were a disclosure, Plaintiffs have failed to adequately plead that the disclosure violated HIPAA for the reasons set forth in Section II(B). Finally, Plaintiffs consented to the disclosure for the reasons set forth in Section I. The tort only extends to "unauthorized" disclosures, and thus, Plaintiffs' breach of confidence claim fails as a matter of law. *Humphers*, 298 Or. at 717.

**B. Plaintiffs' Intrusion Upon Seclusion Claim (Count III) Fails.**

Under Oregon law, intrusion upon seclusion requires "(1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a reasonable person." *Mauri v. Smith*, 324 Or. 476, 483 (1996). The

claim protects against offensive prying, not downstream disclosures. *Humphers*, 298 Or. at 711, 717. Count III fails on each element.

*First*, Providence did not "intrude" upon Plaintiffs. In *K.L. v. Legacy Health*, this Court applied *Humphers* and dismissed the intrusion upon seclusion claim, holding that where a healthcare provider is "a party to Plaintiff's confidential data and its custodian, not an unknown accessor or pilferer of data," the claim "comport[s] with a theory of breach of confidentiality . . . not intrusion upon seclusion." 2024 WL 4794657, at *7.[5] The same analysis applies here: Plaintiffs voluntarily sent their information to Providence—Providence did not pry into any private domain to obtain it. Am. Compl. ¶¶ 36–56. And Providence's Privacy Policy disclosed its tracking practices and offered an opt-out mechanism; no Plaintiff alleges unawareness or attempted opt-out. *Id.* ¶¶ 243, 260 & Figs. 24, 32. An operator who discloses its practices cannot "desire[] to cause an unauthorized intrusion." *Mauri*, 324 Or. at 484.

*Second*, no intrusion *into a private matter* is alleged as to any Plaintiff. Indeed, the Amended Complaint's own allegations establish that much of the activity occurs on publicly accessible pages—the "Learn More" redirects, Am. Compl. ¶¶ 187–190, 238–39, the "Find Help" tool, *id.* ¶ 191, and the urgent care locator *id.* ¶¶ 193–94. Activity on unauthenticated, public pages is not a private affair. *K.L.*, 2024 WL 4794657, at *4. And as for the Portal, the Amended Complaint at best identifies only some information that Plaintiffs viewed on the Portal, but does not adequately plead that such information was transmitted to the Third-Party Vendors, as explained in Section II(B)(2). *See* Am. Compl. ¶¶ 201–41.

---

[5] The court expressly declined to follow *M.R. v. Salem Health Hospitals & Clinics*, noting it "[did] not find the analysis in *M.R.* to be persuasive in analyzing this claim because *M.R.* did not address *Humphers* in reaching its conclusion." *K.L.*, 2024 WL 4794657, at *7 n. 12.

*Third*, the alleged conduct is not "highly offensive." Rather, deploying analytics tools is standard commercial practice. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (collecting browser history and personal data is not "highly offensive" but instead "routine commercial behavior"); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (disclosure of unique user ID and browsing data was not highly offensive). That Providence operates a healthcare Website and Portal does not transform routine commercial behavior into "highly offensive" conduct, particularly where no identifiable health information about any Plaintiff was alleged to have been collected. *Cf. R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 891–94 (C.D. Cal. 2024) (finding disclosure of protected health information highly offensive where it involved medication and treatment related to specific health conditions). Further, a reasonable person who uses a website that discloses its data practices cannot claim those practices are "highly offensive." To the contrary, by agreeing to the Privacy Policy, Plaintiffs waived the right to claim that such disclosed practices, which they do not allege to have opted out of, were highly offensive.

**C. Plaintiffs' Unjust Enrichment Claim (Count IV) Fails.**

To prevail on an unjust enrichment claim, a plaintiff "must establish that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware that it had received a benefit; and (3) under the circumstances, it would be unjust for the defendant to retain the benefit without paying for it." *Winters v. County of Clatsop*, 210 Or. App. 417, 421 (2007); *see also* Cron, 255 Or. App. at 130 (similar). The Oregon Supreme Court has clarified that courts "should examine the established legal categories of unjust enrichment as reflected in Oregon case law" rather than apply a free-floating equitable inquiry. *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 124–32 (2017). Accordingly, the alleged wrongfulness "must be grounded in recognized legal principles, rather than abstract notions of morality." *Cumming v. Nipping*, 310 Or. App. 780, 785 (2021) (quotation marks omitted). Plaintiffs' unjust enrichment claim fails for multiple reasons.

*First*, as a threshold matter, Plaintiffs have not pled the absence of an adequate remedy at law. That is fatal. As this Court has explained, "equitable remedies are appropriate only when there is no adequate remedy of law—that is, when there is no 'practical, efficient, and adequate' solution in the law." *K.L.*, 2024 WL 4794657, at *9 (quoting *Martell v. Gen. Motors LLC*, 492 F. Supp. 3d 1131, 1148 (D. Or. 2020)).[6] Here, Plaintiffs have not pled their unjust enrichment claim in the alternative. And the Amended Complaint seeks actual, statutory, compensatory, and punitive damages as well as restitution and disgorgement. Am. Compl. at Request for Relief ¶¶ C–E, G. It is inconsistent to pursue these legal remedies and equitable relief simultaneously without pleading that the former are inadequate. *Easterbrook v. LinkedIn Corp.*, No. 6:22-cv-01108-MC, 2023 WL 3022497, at *4 (D. Or. Apr. 20, 2023). The unjust enrichment claim should be dismissed for that reason alone.

*Second*, Plaintiffs did not adequately allege they conferred a "benefit" on Providence. This Court has held that "medical information of patients" can be a benefit conferred. *M.R.*, 2024 WL 3970796, at *7 . But as explained above, Plaintiffs did not plausibly allege ***their*** medical information was disclosed as part of the online activity they allege undertaking, but instead rely on allegations of what the online tracking tools are theoretically capable of disclosing for a hypothetical patient. That pleading failure dooms all of their claims, including for unjust enrichment. *See* *B.K.*, 721 F. Supp. 3d at 1070 ("Without specific allegations about the underlying information that was allegedly disclosed, it is unclear to the Court how, if at all, Defendant was unjustly enriched. . . . [T]he Complaint does not include facts specific to unjust enrichment of Defendant resulting from Plaintiffs' information.").

[6] In *K.L.*, this Court permitted an unjust enrichment claim to proceed in an analogous wiretapping action only because Plaintiff, in accordance with Federal Rule of Civil Procedure 8(d), pled her unjust enrichment claim in the alternative. *Id.*

*Third*, even if Plaintiffs had adequately alleged that they conferred a benefit on Providence (which they have not), the retention of that benefit is not "unjust." Plaintiffs' theory of "unjustness" depends on the premise that Providence's data practices violated the law. For the reasons set forth above, Plaintiffs' claims fail. Where the underlying claims collapse, a derivative unjust enrichment claim cannot survive independently. *McAllister Constr. Co. v. Liu*, 343 Or. App. 53, 62–63 (2025). The Amended Complaint's invocation of "principles of fairness and equity," Am. Compl. ¶ 348, is the "abstract notion[] of morality" Oregon courts have held insufficient. *Cumming*, 310 Or. App. at 785.

Accordingly, Plaintiffs' unjust enrichment claim (Count IV) fails as a matter of law and should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Providence respectfully requests that the Court dismiss Plaintiffs' Amended Complaint in its entirety and with prejudice.[7]

**Dated**: June 22, 2026

/s/ David B. Schwartz

David B. Schwartz (*pro hac vice*)
david.schwartz@arnoldporter.com
Jami Vibbert (*pro hac vice*)
jami.vibbert@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street

[7] Dismissal with prejudice is warranted because Plaintiffs have already had an opportunity to re-plead and, as detailed above, "any proposed amendment would be futile." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990) (holding that dismissal with prejudice is appropriate where it is not possible for plaintiff to amend "without contradicting any of the allegations of his original complaint" and explaining that an "amended complaint may only allege 'other facts consistent with the challenged pleading'" (citation omitted)); *see also Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010) (finding district court did not abuse its discretion in denying leave to amend complaint because "there were no new facts that [plaintiff] would include in her complaint to overcome its shortcomings").

New York, NY 10019
Tel: 212-836-8000

Jason Ross, OSB No. 231074
jason.ross@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: 202-942-5000

Daniel E. Raymond (*pro hac vice*)
daniel.raymond@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
300 N. LaSalle Dr.
Suite 3500
Chicago, IL 60654
Tel: 312-583-2379

*Attorneys for Defendant Providence Health & Services*